SOMMERVILLE, J.
Defendant, Werner, was charged with and convicted of the murder of Frank T. Connor, a police officer, on February 14, 1918, in a drug store, in the city of New Orleans. He was sentenced to be hanged. He appeals from the judgment ■ and sentence. Fazende was found guilty without capital punishment. He has not appealed.
The state, on cross-examination of Werner, who had taken the witness stand in his own behalf, asked him:
“While you were here [in New Orleans] had you not held up another man and woman in another place of business at the point of a pistol and robbed them?”
The question was objected to, but the ground of objection was not stated at the time the objection was made. This was irregular. But, in the bill reserved to the ruling of the court permitting the question to be answered, the objection is alleged to have been that:
“That question had no connection with the case on trial, it was an attempt to prove another crime other than the one for which the accused was being tried, not a similar crime as the crime charged, and could not show motive or intent if answered; and was therefore improper and not competent.”
[1] In the note made by the district attorney, which is attached to the bill, and adopted by the judge, it is stated that the question was asked in order to attack the credibility of the witness. It was competent for such purpose.
In the case of State v. Suire, 142 La. 102, 76 South. 254, it is held:
“It is too well settled to require citation of authority that, although the character of the defendant in a criminal prosecution is not subject to attack by the state unless the defendant puts his character at issue, nevertheless, if he becomes a witness in his own behalf, he thereby subjects his testimony to impeachment and puts his credibility at issue, like that of any other witness.” State v. Hughes, 141 La. 579, 75 South. 416.
“Under most, if not all, of the modern, statutes, the accused may become a witness if he so desires; but he is' not obliged to, and, if he does, he is, in general, subject to cross-examination and impeachment the same as any other witness, so long as his constitutional rights or privileges, not in some way expressly waived by him, are not infringed upon.” State v. Waldron, 128 La. 559, 54 South. 1009, 34 L. R. A. (N. S.) 809; Elliott on Evidence, vol. 4, p. 60, No. 3705.
[2] It appears from an examination of Werner’s testimony that he had testified before the jury that he had only gone into the drug store, where the homicide was committed, for the purpose of robbing the proprietor, and not for the purpose of killing any one, and that, if he had known that the deceased was a policeman, he would not have entered the store; that he only fired the fatal shots to save his own life, and would not have' entered the place if he thought he might be resisted by a police officer; and that he had only fired upon the deceased after'the latter had attempted to kill him.
The apparent object of defendant’s testimony was to lead the jury to believe that he *383 would not have entered a place where conditions might have arisen which would cause him to do violence.
A defendant, whose previous conduct shows that he has no regard for human life, may not take the witness stand in his own behalf, and by his testimony try to impress upon the jury that his intention was only to commit a crime which should not have resulted in the taking of a human life, and that the killing which resulted was due to circumstances which he could not have foreseen, and then object to questions asked on cross-examination which would show that, instead of being a person who was seeking to avoid the taking of human life, he was one who cared not whether, in the accomplishment of his purpose, he did or did not kill a human being.
The credibility of such a witness and his testimony may certainly be attacked by showing that he had hejd up others at the point of a pistol.
Immediately preceding the question objected to (all of defendant’s testimony is in the transcript, attached to a bill of exceptions), defendant was asked: “How long have you been in New Orleans?” He answered: “ ‘Bout two weeks.” He was then asked: “What have you been doing while here?” And he answered: “Well, I was going around different places.” Then he was asked the question objected to: “While you were here, had you not held up another man and woman in another place of business at the point of a pistol and robbed them?”
The question had no direct connection with the case on trial, but the circumstances leading up to the murder charged in the case, where the deceased was killed because he resisted the demand of the defendant upon the' owner of the property to hold up his hands and deliver it, show that the district attorney was not attempting to prove another crime than the one for which the accused was being tried; but, by the question, he was endeavoring to discredit the credibility of the testimony of the defendant, who by his evidence was trying to impress the jury with the idea that at the time he entered the drug store where the murder was committed his sole object was to commit robbery. Under such circumstances, it was proper to ask the witness if before the killing he had held up other people in a different place at the point of a pistol and robbed them. State v. Williams, 111 La. 179, 35 South. 505.
The witness had testified:
“I went in there — I did go in on the si3e, you understand — there was a curtain on each side of the prescription counter that hid them from view in front of the drug store, and when I pulled that curtain back the druggist and his little boy were coming down the little step from the adjoining room in the back, and the door was in the middle by the prescription counter, and the curtain hid the back on each side, and the door was right in the middle; you see, the prescription counter is clear across the store, and on each side they have these curtains, and when I drew the curtain aside and the druggist and little boy were coming down the steps, and I told him to throw up his hands in that position, and he threw up his hands and run and grabbed the little boy and ran behind the desk, I put my gun in that position, and a voice said, in the other room, ‘I’ve got him,’ and before I knew what it was, I saw a pistol come up, and I fired three times, not knowing it was an officer at the time. If I knew it was an officer I would not have gone in there. After I fired I ran away. Q. You say that after you got in there you told the druggist to hold up his hands, and the druggist went behind the desk? A. Yes, sir; he grabbed his little boy and went behind the desk. ■ I followed the druggist around in the store, around the counter, and some one hollered, ‘I’ve got him,’ when I passed the door, and I saw the gun come up, and I fired right quick like that. I knew that I would be killed at the time; it was impossible for me to get away.”
This testimony was given on defendant’s examination in chief.
On cross-examination, defendant answered:
“I went there to rob him (the druggist). * * * Q. You went in that place to rob and *385 went in that place to kill if necessary? A. No, sir. Q. Why, if you did not intend to kill, if necessary, did you carry your pistol loaded in your hands; to keep from getting killed yourself? A. For protection. * •* * Q. I am trying to find out if you only intended to rob the place why you carried the pistol in your hands? A. I did not want to hurt any one. Q. You pointed the pistol at the drug store man? A. Yes, sir. Q. At his head? A. Yes, sir. Q. Suppose that he had attempted to draw a pistol? A. I do not know if I would have shot him unless he had a pistol out and drew a level at me. * * * Q. If he came out with a pistol to protect his property and himself you would have killed him? A. If he tried to kill me; yes, sir. Q. Your idea was to go in that place and rob it, and, if that man resisted you so that you might be in danger, you would take that man’s life? A. Well, if he was about to kill me; otherwise I would not. * * * Q. If he had a pistol you would have killed him? A. If he tided to kill me; yes, sir. Q. How long have you been in New Orleans? A. About two weeks. Q. What have you been doing while here? A. Well I was going around different places. Q. While you were here had you not held up another man and woman in another place of business at the point of a pistol and robbed them?”
This was the question objected to, and a bill was reserved to the ruling of the court in permitting the defendant to answer:
“A. Yes, sir. Q. How long was that before the killing, about, I don’t want the exact date? A. About three days, I guess. Q. Who was with you at the time? A. Fazende was with me. Q. Who was with you when this policeman was killed? A. Fazende (the codefendant). * * * Q. When you held up the soldier and the woman who was with you? A. Fazende.”
The defendant further answered, on cross-examination, without objection, that he had deserted from the United States army, in which he had enlisted under an assumed name, for fear that he would be found out as an ex-convict from Baton Kouge, where he had served a term in the penitentiary of 10 years for homicide. He also answered that he had been in the United States penitentiary at Leavenworth, Kan., for robbing interstate shipping.
Further testifying, without objection, defendant answered the question:
“How close were you to the proprietor of the store where the murder was committed, when you put the pistol to him (the proprietor)? A. I just came through the curtain. * * * Q. IVhere was Fazende? A. Out in front. Q. Doing what? A. I guess he went to the register; I did not see what he was doing. * * * Q. If they had tried to hurt you so that you thought that you were in danger, you did not intend to be hurt? A. I did not intend to be killed; no, sir. Q. You would kill rather than be killed? A. Yes, sir. Q. You wanted to see that no one interfered with you or hurt you? A. I did not want to be hurt; no sir. Q. And the other man was to do the robbing? A. Yes, sir. Q. One to do the robbing and you to keep any one from interfering? A. Yes, sir.”
The question objected to was entirely relevant, and the objection was properly overruled. The answer clearly discredited defendant’s testimony to the effect that he only intended to rob, and not to kill if he was resisted.
[3] The next bill of exceptions was taken by the defendant Werner to a question propounded by the district attorney to Fazende, the codefendant. The two defendants were being tried jointly. Fazende had taken the stand as a witness on his own behalf. Fazende did not object to the question, and he has not appealed. Fazende was asked: “Did you not make a statement to the police that he (meaning Werner) said something to Con-nor (the deceased) ?” The answer was: “No, sir.” Fazende was testifying as to what took place at,the time of the killing. It was therefore relevant, in order to attack his credibility as a witness, to ask him if he had not made a different statement of the transaction shortly after its occurrence. The defendant, Werner, not having asked for a severance, was not in a position, on the trial of the case, to object to evidence which was relevant to impeach the testimony of his co-defendant, on the ground that the question would bring out facts detrimental to him. *387 The question asked was to impeach Fazende, and to show that he had previously made a different statement. It was not only to attack his credibility as a witness, but for the purpose of laying the foundation to impeach his testimony.
When Werner, the defendant, objected to the testimony of Fazende, his codefendant, the court instructed the jury that the statement of the witness did not apply to Werner, and not to pay any attention to what was said as to Werner. The instruction of the court fully protected Werner from the effects of the evidence as to his guilt or innocence.
The third bill relates to the matter embraced in the second bill. It was reserved to the testimony of the stenographer, connected with the office of the superintendent of police, who testified in rebuttal as to what Fazende said in his statement to the superintendent of police in describing tile killing, after Fazende’s arrest. It was offered for the purpose of impeaching the witness Fazende. And it could have no other effect, under the instructions of the judge to the jury that they were not to consider the testimony of the witness in connection with the defendant Werner.
Bill numbered 4 was taken to a special charge requested by the state, as follows, which was given by the judge to the jury:
“One in the actual perpetration of a felony by violence cannot plead self-defense when one is killed while attempting to prevent such felony.”
The special charge was unobjectionable.
[4] The defendant’s evidence showed that, at the time of the killing, he was in the actual perpetration of a felony by violence; that he was armed with a dangerous weapon, and had already assaulted the proprietor of the place with this weapon.
“ * * # When the slayer’s own original act was in violation of law, the law takes that fact into consideration in limiting his right of defense, and resistance while engaged in its perpetration. And if he was engaged in the commission of a felony, and to prevent its commission a person seeing it, or about to be injured by it, made a violent attack upon him, calculated to produce great bodily harm, and in resisting such attack he killed his assailant, the law imputes the original wrong to the homicide, and makes it murder.” Wharton on Homicide (3d Ed.) p. 548.
« * * * a homicide committed in the perpetration of a felony is murder, whether there was any precedent intention of doing a malicious act or not, the engaging in the perpetration of the felony supplying the place of malice. And this rule applies with especial force if death was the probable consequence of the felonious act. And in order to show that a killing was such as to constitute murder, it is competent to show that it was done in the commission of, or attempt to commit, a felony, whether such felony was committed or attempted as the result of a conspiracy or not. An unlawful act which would render a killing pursuant thereto murder, however, though done without malice, should be such as to tend to the injury of another, either immediately or by necessary consequences. It must be equivalent in legal character to a criminal purpose aimed at life, and either a felony, or an act involving the wickedness of felony.” Wharton on Homicide (3d Ed.) p. 113.
Bill numbered 5 was reserved to the refusal of the judge to give to the jury the following special charge asked for by defendant:
“That if the jury find from the evidence that, although the defendant was in the act of committing a felony at the time of the killing of the officer, but that the conduct of the officer at the time was such as to induce the defendant Werner to believe that he was about to be killed or to receive great bodily injury at the hands of the officer, and that he did not know that the person making the assault was an officer seeking to arrest him, then, under such circumstances, the killing would be manslaughter.”
The per curiam of the court, attached to the bill, is:
“The defendant was in the perpetration of a violent felony, and could not plead self-defense, or tender any such reason for lowering the grade of the offense.”
The ruling is in line with the law quoted from Wharton in considering the bill numbered 4.
*389 On the brief of defendant, it is argued that defendant was entitled to have the jury charged, under R. S. 785, that it might bring in a verdict of manslaughter on a trial for murder.
Defendant in the requested charge does not ask the court to charge the jury that it might bring in a verdict of manslaughter; and, it does not appear that the court r effused to do so. The charge is not in the transcript; and, as it was the duty of the judge to charge the jury that it might find the prisoner guilty of manslaughter, it must be presumed that he did so charge.
As the charge is not before the court, it cannot be held to be insufficient.
The sentence pronounced against Werner, “that he be taken to the state penitentiary at Baton Rouge, La., there to be hanged by the neck until he be dead,” is not in conformity with Act 133 of 1918, p. 227, and it will be amended.
It is therefore ordered, adjudged, and decreed that the judgment and sentence appealed from be amended so as to order the execution of Werner in the city of New Orleans, parish of Orleans; and, as thus amended, it is affirmed.
O’NIELL, J., dissents from the ruling that evidence of another crime was admissible, and therefore dissents’ from the decree.