COMMONWEALTH *vs.* JOHN J. DEVEREAUX.

SAME *vs.* EDWARD J. HEINLEIN.

SAME *vs.* JOHN J. McLAUGHLIN.

Middlesex.     March 15, 1926.—June 9, 1926.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Homicide.   Conspiracy.   Practice, Criminal, Exceptions.*

At the trial of three defendants for murder, there was evidence that the three drove in an automobile to a car barn of a street railway company in the night time; that two, armed, went to the office of the cashier on the second floor, placed the occupants in fear of their lives and stole money; that the third, armed, was left on guard below, where he placed two men in fear of their lives and made them lie down and then shot and beat a watchman who had seemed to offer him resistance, as a result of which the watchman died. The evidence of the Commonwealth was that the watchman was killed while the other two defendants were in the cashier's office, and the evidence of the defendants was that at that time the first two defendants had retired to and were waiting in the automobile. *Held,* that

(1) The robbery did not end when the defendants secured possession of the money: it was not completed while some of the defendants were on their way from the office to the floor below, or while they were in the automobile, waiting for the third defendant;

(2) It was proper to refuse to instruct the jury: "The commission or attempted commission of the crime punishable with death or imprisonment for life which the Commonwealth alleges was the robbery of the car barn ended when the defendants had secured possession of the money taken by them and when they had left the building where that money had been secured";

If two or more combine to commit a robbery and a homicide results, each is criminally responsible for the acts of his associates in the perpetration of the common design for which they conspired; and it is no defence for the associates of the one who committed the homicide, that they

did not intend to take life in its perpetration, or that they forbade their companion to kill.

The use of any degree of force against a robber holding one up with a pistol is justifiable, and, if the robber in those circumstances kills in self defence, the crime is murder.

At the trial above described, the third defendant testified and admitted that at the time of the killing he was engaged in a robbery, armed with a dangerous weapon; that he had forced two men to lie on the floor and held them there in fear; that, when he met the watchman, he told him to "throw up his hands and drop the lantern." He further testified that the watchman swung the lantern and "I ducked and I pointed a gun downwards and fired a shot. He . . . grabbed me," and "I hit him two or three times on the head," and that when he fired he did not intend to hit him, he fired to "scare him" and when he hit him on the head, he did not intend to kill him. The judge refused to instruct the jury, at the request of the third defendant, "Under an indictment charging murder in the first degree, the jury may find the defendant guilty of murder in the first degree or guilty of murder in the second degree or guilty of manslaughter;" and instructed them that there was to be no verdict of manslaughter or of assault and battery. *Held*, that

(1) The instruction asked for properly was refused and the instruction given constituted no error;

(2) It was proper to leave to the jury the question, whether the murder was committed with extreme cruelty or atrocity.

Instructions given at the trial above described as to responsibility in law of the first two defendants for the act of the third were *held* to have given in substance requests of the two defendants for rulings upon that issue, so far as they were correct in law, and fully to have protected the rights of such defendants.

In the circumstances above described, it was not essential to the conviction of the defendants that murder should be a part of the original plan, if it was one of the probable consequences of the robbery by the defendants, armed, as they were, with deadly weapons.

No harm was done to the defendants at the trial above described by the judge's informing the jury that they should be prepared, when their verdict was read, to answer as to the ground upon which they based their findings, it appearing that no such inquiry was made of the jury.

One defendant at the trial above described testified that, prior to the night of the robbery, he never carried a gun. He then was asked if he had ever pointed a gun at a person in Boston. He replied, "No." The question then was asked, if he did not point a revolver at a certain police officer's head. He answered in the negative. The judge thereupon told the jury that the defendant was not prejudiced because of his negative answer, and "the denial does not give any evidence to the contrary." *Held*, that the defendant was not prejudiced by such questions.

THREE INDICTMENTS, found and returned on October 7, 1925, charging the defendants, respectively, with the murder of James H. Ferneau on October 4, 1925.

In the Superior Court, the indictments were tried before *Fosdick*, J.   Material evidence and such of the exceptions saved by the defendants as were relied upon in this court are described in the opinion.

On November 29, 1925, the defendants were found guilty of murder in the first degree.   On December 17, 1925, each defendant filed an appeal and on the same day a copy of the transcript of the evidence was delivered to the clerk of the court.   On December 23, 1925, the defendants were notified that the summary of the record was completed and on January 9, 1926, the defendants' assignments of error were filed.

*C. D. Driscoll*, for the defendant Heinlein.

*J. J. Higgins*, for the defendant Devereaux.

*S. Hoar*, for the defendant McLaughlin.

*A. K. Reading*, District Attorney, for the Commonwealth.

CARROLL, J.   The defendants Devereaux, Heinlein and John J. McLaughlin, were convicted of the murder in the first degree of James H. Ferneau.   The crime was committed at the car barn of the Middlesex and Boston Street Railway Company, Waltham, October 4, 1925.

There was evidence that on the evening of Saturday, October 3, the defendants and Peter J. McLaughlin, a brother of John J. McLaughlin, at the time of the trial a fugitive from justice, met at the home of John J. McLaughlin and there planned the robbery.   Peter McLaughlin and Heinlein went to the home of Peter V. King.   They secured an automobile, and King agreed to drive it.   McLaughlin and Heinlein returned to the McLaughlin home, and while planning to commit the robbery at the car barn, if opportunity presented, Heinlein, Devereaux and the McLaughlins examined a pistol and two revolvers.   These were placed with a number of caps in a pillow case which John McLaughlin carried from the house to the automobile.   Heinlein testified that before they left the McLaughlin house it was agreed there would be no harm done to any one in the car barns.   Arriving at the car barn, the three defendants and Peter McLaughlin alighted from the automobile, leaving King in charge of it. Devereaux, Heinlein and Peter McLaughlin "took out a

gun" from the pillow case. John McLaughlin carried the pillow case. Each of the defendants had a handkerchief or towel over his face. There was evidence that Heinlein and the McLaughlins went to the second floor, where the offices of the street railway company were located, and Devereaux remained on the first floor as a guard or lookout. He met one Wingate, a former employee of the railway company. Pointing a pistol at him, he ordered Wingate to throw up his hands and compelled him to lie on the floor. Devereaux also forced Joseph R. Ellery, an employee of the company, to lie on the floor beside Wingate. When the McLaughlins and Heinlein entered the office on the second floor, they ordered the two employees, William P. Baker and William J. Main, to put up their hands. Main was directed to open the door of the inside office or cashier's cage, and, while Main and Baker were held in fear by Peter McLaughlin and Heinlein, John McLaughlin swept the money into the pillow case from the shelf, and also took money from two safes.

According to the evidence of the Commonwealth, while the McLaughlins and Heinlein were robbing the cashier on the second floor, Devereaux met the night watchman Ferneau and ordered him to throw up his hands. Devereaux testified that he asked Wingate and Ellery if there was "Anyone else around here," and, on Ellery's informing him that there was another man on the premises, Devereaux said, "All right, I will go out and get him." He also testified that he did not use the expression "get him" in the sense that he meant to kill, but to "get him," to have him join the others. Devereaux further testified that he told Ferneau to drop the lantern he was carrying, that Ferneau swung the lantern and "I ducked and I pointed a gun downwards and fired a shot. He . . . grabbed me," and "I hit him two or three times on the head." Ferneau died, either from the shot or from the blows on the head. The Commonwealth's evidence tended to show that he was killed in the car barn while Heinlein and McLaughlin were in the office and actually engaged in the robbery. The evidence for the defence tended to show that Devereaux killed Ferneau while Heinlein and the McLaughlin brothers were in the automobile.

After the homicide the defendants returned to Boston and went to the home of one Bennett.

1. Devereaux requested the judge to instruct the jury: "The commission or attempted commission of the crime punishable with death or imprisonment for life which the Commonwealth alleges was the robbery of the car barn ended when the defendants had secured possession of the money taken by them and when they had left the building where that money had been secured." Other requests were made presenting, in effect, the same question.

"Murder committed . . . in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree." G. L. c. 265, § 1. Under G. L. c. 265, § 17, "Whoever, being armed with a dangerous weapon, assaults another and robs, steals and takes from his person money . . . with intent if resisted to kill or maim the person robbed, or, being so armed, wounds or strikes the person robbed, shall be punished by imprisonment . . . for life or for any term of years"; and by § 21 of this chapter, "Whoever, with intent to commit larceny . . . confines . . . or wounds, or attempts or threatens to kill, confine . . . injure . . . or puts any person in fear, for the purpose of stealing from a building . . . money . . . or other valuables . . . whether he succeeds or fails in the perpetration of such larceny or felony, [shall] be punished" by life imprisonment.

The judge fully instructed the jury on this aspect of the case. There was no error in refusing Devereaux's request for instructions. After stating that the Commonwealth made no contention that the defendants were robbing Ferneau, that the person robbed was the cashier of the street railway company, the judge instructed the jury that, if they found that a homicide was committed, and robbery of the kind mentioned in the statute, it would be necessary for them to determine "whether or not the robbery had begun and was taking place at the time the murder was committed, because unless the murder took place while the robbery was going on it was not committed in the commission of the robbery."

The defendants were joint conspirators. They went to

the car barn in order to perpetrate the crime of robbery. Three of them were armed with deadly weapons. The robbery did not end when the defendants secured possession of the money. It was not completed while some of the defendants were on their way from the office to the floor below, or while they were in the automobile, waiting for Devereaux. He still held Wingate and Ellery in fear and was seeking Ferneau to put him in fear or "get him," as he expressed it, that the robbery might succeed, and while his associates were securing the fruits of the robbery. The commission of the crime continued as matter of law during this time, while Devereaux, in carrying out the original plan, met and killed Ferneau. Although his companions had at that time left the building, they were still in possession of stolen property, but not in absolute control of it, and the robbery was not completed when the homicide was committed, even if the evidence of the defendant were believed.

The jury were instructed that "if . . . the robbery was ended when the killing was done . . . the defendants are not guilty in the first degree, so far as that statute [G. L. c. 265, §§ 17, 21] is concerned." The question, whether G. L. c. 265, §§ 17 and 21, would apply if the defendants had already escaped from the scene of the robbery when Ferneau was killed, we are not called upon to decide. The fact, if true, that Heinlein and the McLaughlin brothers were in the automobile when Devereaux committed the homicide, did not establish the fact that the robbery was then completed. The conspiracy had not been abandoned. Devereaux, according to his own testimony, was acting in concert with the others and was carrying out the purpose of the conspiracy. It is settled law that if two or more combine to commit a robbery and a homicide results, each is criminally responsible for the acts of his associates in the perpetration of the common design for which they conspired; and it is no defence for the associates engaged with others in the commission of a robbery, that they did not intend to take life in its perpetration, or that they forbade their companions to kill. *People* v. *Lawrence,* 143 Cal. 148. *People* v. *Wilson,* 145 N. Y. 628. See *State* v. *Darling,* 216

Mo. 450. *People* v. *Friedman*, 205 N. Y. 161. See also *State* v. *Cross*, 72 Conn. 722; *State* v. *Hopkirk*, 84 Mo. 278, 287; *People* v. *Olsen*, 80 Cal. 122. It has been decided that one is justified in using any degree of force against a robber holding him up with a pistol, and if the robber kills in self defence the crime is murder. *State* v. *Werner*, 144 La. 380. *State* v. *Martin*, 94 N. J. L. 139. There was no error in refusing the request and the defendants cannot complain of the instructions given. *State* v. *Brown*, 7 Ore. 186. See *State* v. *McCahill*, 72 Iowa, 111; *Conrad* v. *State*, 75 Ohio St. 52.

The facts disclosed in many of the cases relied on by the defendant Devereaux distinguish them from the case at bar. In this case the original plan of robbery had not been abandoned; the money had not been surrendered or relinquished; none of the defendants were under arrest. Even if some of the defendants were not in the building when the homicide was committed, they were at the time carrying away the stolen property; they had it in their possession; they were awaiting the arrival of Devereaux who was then carrying out the purpose of the conspiracy. In so far as any of the decisions relied on are in conflict with what we have decided, we must decline to follow them.

2. Devereaux requested the judge to instruct the jury: "Under an indictment charging murder in the first degree, the jury may find the defendant guilty of murder in the first degree or guilty of murder in the second degree or guilty of manslaughter." The judge refused to give this instruction and instructed the jury that there was to be no verdict of manslaughter or of assault and battery. Devereaux was engaged in a robbery; he admitted this. He was armed with a dangerous weapon. He had forced Wingate and Ellery to lie on the floor. They were still held in fear, within the language of the statute, when he met Ferneau. He told Ferneau to "throw up his hands and drop the lantern." He testified to Ferneau's attitude, but there was no evidence in the case which warranted the judge in instructing the jury as requested, and there was no error in telling them there could be no verdict of manslaughter against Devereaux. There

was no evidence which made these requests of the defendant Devereaux applicable. He testified that when he fired he did not intend to hit him, he fired to "scare him" and that, when he hit him on the head, he did not intend to kill him. A homicide committed in the commission of a felony is murder at common law. *Commonwealth* v. *Pentz*, 247 Mass. 500, 508. *Commonwealth* v. *Pemberton*, 118 Mass. 36, 43. *State* v. *Hopkirk, supra. State* v. *Cross, supra.* Devereaux's testimony of his intention not to take the life of Ferneau, if believed, did not exempt him from the crime of murder, as at the time he was engaged in the commission of the robbery. *People* v. *Lawrence, supra. People* v. *Wilson, supra.* See *Commonwealth* v. *Fox,* 7 Gray, 585.

3. The judge left the question, whether the murder was committed with extreme atrocity or cruelty, to the jury. Devereaux asked for an instruction that the means used by him, compared with ordinary means of procuring death, were not extremely atrocious or cruel. In the course of the charge in this particular aspect of the case, the judge quoted from *Commonwealth* v. *Gilbert,* 165 Mass. 45. In Devereaux's explanation of the killing of Ferneau, he testified that when he told Ferneau to throw up his hands, he was fifteen feet from him; "He swung the lantern and . . . I pointed a gun downwards and fired a shot. He dropped the lantern and reached out his arms and grabbed me . . . . I reversed the gun and I hit him two or three times on the head, probably landing him solidly once." On all the circumstances of the case, there was no reversible error in leaving the question of whether the murder was committed with extreme cruelty or atrocity to the jury to decide. *Commonwealth* v. *Feci,* 235 Mass. 562, 571, and cases cited. *Commonwealth* v. *Gilbert, supra.*

4. McLaughlin and Heinlein made a number of requests for instructions, in effect, that they were not responsible for the murder by Devereaux, unless the murder was a natural or necessary consequence of the principal enterprise, or something they ought reasonably to have foreseen as a probable consequence of the robbery. The jury were properly instructed on the matters involved in these requests.

The defendants' rights were fully protected. In so far as the requests were correct in law, they were given in substance. The judge told the jury: "There is evidence in the case which, if believed, would warrant you in finding that Heinlein and John and Peter McLaughlin and Devereaux were acting by prearrangement and with a common purpose in their robbery at the car barn, and if you find that they were so acting it is not necessary that you should determine the exact time when and place where the purpose was formed and the prearrangement made." Again, "Devereaux, Heinlein and McLaughlin are not being tried as principals in either of the crimes under § 17 or § 21, though the question, whether or not they were such principals, must be answered and for this reason: They are being tried as principals in a murder. It is not claimed that Heinlein and McLaughlin struck Ferneau, the deceased. It is claimed that Devereaux did. If all three were principals in the crime of robbery while armed with intent to kill the person robbed if resisted, and if Devereaux inflicted fatal wounds on Ferneau while the others were committing such armed robbery and if he inflicted those wounds for the purpose of preventing Ferneau from interfering either with the other defendants in doing their part of such robbery, or with himself, Devereaux, in acting as guard or lookout, and if from those wounds Ferneau died, the act of Devereaux was murder in the first degree and the defendants Heinlein and McLaughlin are also guilty of murder in the first degree."

It was not essential that murder should be a part of the original plan, if it was one of the probable consequences of the robbery by the defendants, armed, as they were, with deadly weapons. "There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that if he combines and confederates with others to accomplish an illegal purpose, he is liable *criminaliter* for the acts of each and all who participate with him in the execution of the unlawful design." *Commonwealth* v. *Campbell*, 7 Allen, 541,

543, 544.   *People* v. *Lawrence, supra.   People* v. *Wilson, supra.   People* v. *Friedman, supra.*

5. The judge informed the jury that they should be prepared when their verdict was returned to answer as to the ground upon which they based their findings. Exception was taken to this. No questions were, in fact, asked the jury, and this disposes of the exception, without intimating that there would have been error if the questions had been asked. The defendants were in no way prejudiced by the statements of the judge.

6. Heinlein testified that, prior to the night of the robbery, he never had carried a gun. He was then asked if he ever had pointed a gun at a person in Boston. He replied, "No." The question then was asked if he did not point a revolver at Officer Somerville's head. He answered in the negative. The judge thereupon told the jury that the defendant was not prejudiced because of his negative answer, and "the denial does not give any evidence to the contrary." Under these circumstances we do not think that Heinlein was prejudiced by the questions put by the district attorney.

We have examined all the exceptions of the defendants, as well as the rulings by the presiding judge. We find no error in the refusals to give the defendants' requests or in the rulings given. The robbery was planned by the defendants. They were engaged in it when the homicide was committed; having associated for the purpose of committing the felony, each was liable for the murder while the original offence was in progress.

Under appropriate instructions, the jury have found the facts. They have found the defendants guilty of murder in the first degree. These findings we cannot disturb. They are final. As there was no error of law, the exceptions must be overruled.

*Exceptions overruled.*
*Judgments on the verdicts.*