COMMONWEALTH *vs.* JOAQUIM PITA SOARIS.

Middlesex.   March 2, 1931. — April 6, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & SANDERSON, JJ.

*Homicide.   Practice, Criminal,* Examination by department of mental diseases, Examination by defendant's mental expert, Charge to jury, Requests, rulings and instructions. *Evidence,* Admissions and confessions, Presumptions and burden of proof. *Insanity.*

A report of two experts under G. L. c. 123, § 100A, in the amended form appearing in St. 1929, c. 105, of their examination of one indicted for murder by shooting stated that the defendant was then "mentally depressed" but did not "present other evidence of mental disease" and recommended "that he be sent to some hospital until such time as he recovers from his present condition."   On the filing of the report, a judge of the Superior Court ordered the defendant committed for observation to the Bridgewater State Hospital for sixty days, and that a report be made within thirty days.   The medical director of that hospital reported that, "beyond being depressed" when committed to the hospital, the defendant "showed nothing abnormal in his mental reactions," "that he has apparently recovered at this time, does not show any depression of any sort" and that he was "well enough to be returned" to court "and stand trial" on the indictment. *Held,* that the reports of the official experts, plus the report of the medical director, constituted a compliance with the statute, and that the facts so found and reported justified the judge in directing that the defendant be put to trial upon the indictment.

The defendant in the indictment above described moved that the trial be postponed to permit a further examination by a physician, who had examined the defendant soon after the shooting when he was not satisfied as to his mental condition and who by his own illness had

been prevented from further examination. The motion was denied. *Held*, that

(1) The disposition of the motion was within the discretion of the trial judge and no abuse of discretion was shown.

(2) In his consideration of the motion the trial judge could give weight to the report of the medical director, above quoted.

Statements of fact relating to events leading up to the shooting and to the shooting itself, made to a captain of police by the defendant in the indictment above described in a hospital shortly after the shooting and to the medical director of Bridgewater State Hospital during his confinement there, were admissible in evidence at the trial of the indictment although at the time the statements were made the defendant was not told that he was in custody and was not warned that anything he said might be used in evidence against him.

The trial judge, in instructing the jury before whom was being tried the indictment above described with respect to the defendant's contention that he was of unsound mind at the time of the shooting, called their attention "to the absence of any medical testimony, except the very slight evidence offered by . . . [the medical examiner] with reference to his [the defendant's] condition, and the statement by . . . [a physician who testified for the defendant] that he was unable to form an opinion while this man was there at the hospital." *Held*, that such instruction showed no error.

In further instructions at the trial above described, the judge stated: "Assuming there were experts brought in here, half a dozen on each side, and, in answer to a hypothetical question, they gave an opinion, one set of experts saying that in their opinion he was insane at the time, and another set saying that he was not. Now, that evidence is 'opinion' evidence, merely the opinion of these gentlemen. It is assumed that they know more about the subject, such a subject as that, than you or I, and that their opinion will be of aid to a jury in determining what is a pure question of fact, and the jury would have the right to disregard all the experts or any one of the experts, and decide the case on what they heard of this man, and his own story. So keep that in mind when you are considering that question." The defendant contended that such instructions were erroneous and prejudicial because the judge in express words also should have told the jury that they could believe the experts, and that by the failure to do so they "were practically invited to throw the expert testimony out of the case." *Held*, that such instructions showed no error.

Two indictments, charging the same defendant with the murder of a woman and of a girl ten years of age, were tried together. The evidence showed that the defendant, under the influence of liquor, and enraged by being spurned by the woman, to whom he had been engaged to be married, approached and sought an interview with her as she sat in an automobile beside the child; that she refused to confer with him, and that thereupon he shot her four times, some of the bullets also entering the body of the child and killing her. The judge instructed the jury that the killing of neither the woman nor the child could be

found to be manslaughter, for the reason that manslaughter is "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat"; that "words of reproach, however grievous, are not provocation sufficient to free the party killing from the guilt of murder; nor are contemptuous or insulting actions or gestures, without an assault upon the person." *Held*, that no error was shown.

In the circumstances above described, the fact that the defendant was drunk at the time of the shooting might have rendered him incapable of conceiving a deliberately premeditated intention to kill which necessarily must be present to support conviction on an indictment for murder in the first degree; but it would not make manslaughter an act, which, if committed while the defendant was sober, would have been murder.

There being no evidence at the trial above described warranting a finding of manslaughter, it was immaterial which of the two victims was shot first, and a refusal to instruct the jury with relation thereto was proper.

At the trial of the indictments above described, the defendant made certain requests for instructions in an effort to direct "the jury's attention to a narrower question or contention, namely, that, although there is a general presumption at the start of any case that the defendant is sane, nevertheless, when evidence has been introduced which raises a question of doubt as to the sanity or insanity of the defendant, then, in that case, the burden is upon the Commonwealth to prove, or to satisfy the jury beyond a reasonable doubt, that the defendant was sane in the sense that he was legally responsible for his acts at the time of the offence." The judge instructed the jury as follows: "The government must satisfy you, as I have called to your attention, that he understood what he was doing, had knowledge of what he was doing, as I have already said to you. That is the burden resting upon the Commonwealth, to satisfy you upon that beyond a reasonable doubt. If you are not so satisfied, but should find that this defendant was not so capable, by reason of mental disease, under an uncontrollable impulse to kill, springing out of it, why, your verdict would be not guilty by reason of insanity. So that would be the first issue to determine, as to his condition at the time." *Held*, that the subject matter was adequately dealt with in the charge.

Two INDICTMENTS, found and returned on March 4, 1930, charging murder on March 2, 1930, of Angelina Rodriques and of Matilda Silva.

Proceedings preceding the trial are described in the opinion.

The indictments were tried together before *Sisk*, J.

It appeared that Matilda Silva was ten years of age when killed.

The testimony which was contained in assignments of errors numbered 3, 4, and 5, described in the opinion, included a narration of events by the defendant substantially as stated in the second and third paragraphs of the opinion.

Other material evidence is described in the opinion.

The judge's charge on the subject of manslaughter was as follows:

"I instruct you here that the killing of either one of these two girls, on the evidence disclosed here, cannot be manslaughter, for the reason that manslaughter is a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat. If the killing is without such provocation, it is murder. Words of reproach, however grievous, are not provocation sufficient to free the party killing from the guilt of murder; nor are contemptuous or insulting actions or gestures, without an assault upon the person."

The defendant was found guilty of murder in the first degree on both indictments, appealed and assigned the errors described in the opinion.

*J. Linhares,* for the defendant.

*F. A. Crafts,* Assistant District Attorney, for the Commonwealth.

PIERCE, J. On May 22, 1930, after a trial on two indictments, the defendant was found guilty of murder in the first degree of Angelina Rodriques and Matilda Silva. The case is before this court under St. 1925, c. 279, as amended by St. 1926, c. 329, on an assignment of errors.

At the trial the evidence, which was not in great dispute, warranted the jury in finding as proved beyond a reasonable doubt the following facts: The defendant had met Angelina Rodriques at Christmas, 1928, and again in April, 1929. He lived in New York and she in Lowell. During the interval they corresponded. In April, 1929, the defendant visited Lowell, renewed his acquaintance with her, fell in love with her and she with him, and they entered into an engagement to be married. The defendant returned to New York and their correspondence was continued. He

came to Lowell again in May, 1929, and visited her. He did not see her again until he made a visit in February and March, 1930. On this visit he learned that his friend, one Gomes, was to be married on March 1, 1930, to Mary Silva. He did not attend the wedding ceremony but visited the house in the evening. On the following day, after he had purchased a ticket for New York, he visited the Silva house and found some of the wedding festivities still in progress, and there met Angelina Rodriques. He said good-bye to her and started to go to the railroad station. At the station he was told that she the night before was dancing with a married man. When the train arrived he decided not to take it but to take a later train. He returned to the Silva house where the festivities were still going on, and after a while went into the front room where people were dancing. While in this room he saw Angelina Rodriques dancing with one arm on the top of a man and she mocked him with a gesture, which was illustrated to the jury. At about seven o'clock in the evening of March 2, 1930, she left the house and entered an automobile. The defendant followed her and asked her to talk with him. She left the automobile and he asked her what wrong he had done to her that she should mock him. She laughed and said "I got no time. I got to go back." He followed her back to the automobile, handed her the letter she had written him, asked her why she had written him if she hadn't loved him, and she smiled, saying, "Everybody makes a mistake." As the driver was starting the car the defendant shot four bullets, these killed Angelina Rodriques and Matilda Silva who was seated between her and the driver, and wounded the driver.

On the day before and on the day of the shooting the defendant had drunk considerable wine and beer. He testified that he did not remember any of the details of the shooting, and that the first time he knew of it was when he was told about it by the nurse in answer to his questions. He also testified that as the automobile started to move away he thought it "was going in the river," which he said was forty-five or fifty feet away; that he became excited

and then his mind went blank. It was agreed that there was no river at all in the immediate vicinity.

The defendant's assignment of errors numbered 1 is based upon the contention that a compliance with §. 100A of G. L. c. 123, in the amended form appearing in St. 1929, c. 105, is a condition precedent to the placing of the defendant on trial for murder under these indictments, and that the report of the department of mental diseases filed by the two experts fails "to determine his mental condition." The report of the experts contains the "Psychiatric findings: He [the defendant] is at present mentally depressed. Does not, however, present other evidence of mental disease. His depression seems to us to be related to the situation in which he now finds himself. He states that he does not want to live and it is stated by others that he has threatened to commit suicide." In answer to the question: "State definitely whether, in the opinion of the examiner, the prisoner is suffering from any mental disease or defect which would affect his criminal responsibility," the experts replied: "In view of his general condition, we do not believe that he is fit to stand trial at the present time. We recommend that he be sent to some hospital until such time as he recovers from his present condition." On the filing of this report a judge of the Superior Court ordered the defendant be committed for observation to the Bridgewater State Hospital, "there to be confined and treated for a period of sixty days. Report to be made within thirty days." In accordance with the court order the medical director made a report to the court which ended with the summary of facts which follows: "In fact, beyond being depressed he showed nothing abnormal in his mental reactions. He has apparently recovered at this time, does not show any depression of any sort, takes an active interest in the things that are taking place in the ward, enjoys himself playing cards with other inmates, and I am sure he is well enough to be returned to your court and stand trial for the crime for which he is accused." It is plain that the report of the experts, plus the report of the medical director of the Bridgewater State Hospital, is

an answer to the contention of the defendant that the examination of the defendant was perfunctory or incomplete, "so that it appeared that the defendant was as much sane as insane." It is obvious that the reports of the official experts, plus the report of the medical director, are a compliance with the statute, and that the facts so found and reported justified the judge in directing that the defendant be put to trial upon the indictments. *Commonwealth* v. *Devereaux*, 257 Mass. 391, 396. *Commonwealth* v. *Vallarelli*, 273 Mass. 240, 249.

The assignment of errors numbered 2 is based upon the refusal of the judge to allow a motion to continue the trial to permit one Dr. Larrabee to reëxamine the defendant. In support of this motion the defendant's attorney stated, in substance, that Dr. Larrabee had examined the defendant at St. John's Hospital, soon after the shooting, and was at that time not satisfied as to his mental condition; and that the doctor's illness had prevented a reëxamination before the trial. The allowance of the motion rested within the sound discretion of the trial judge, no abuse of which is here shown. *Commonwealth* v. *Donovan*, 99 Mass. 425. *Commonwealth* v. *Drake*, 124 Mass. 21, 24. *Commonwealth* v. *Hurley*, 158 Mass. 159, 162. *Commonwealth* v. *Brothers*, 158 Mass. 200, 205. *Commonwealth* v. *Mercier*, 257 Mass. 353, 364. In his consideration of the motion the trial judge could give weight to the report of the medical director, above quoted. *Commonwealth* v. *Devereaux*, 257 Mass. 391, 395–397.

The assignments of errors numbered 3, 4 and 5 are based upon the contention that the statements made by the defendant to the captain of police in the city of Lowell and to the medical director at the Bridgewater hospital should have been excluded, because they were received without the defendant having been warned of his legal rights relative to answering questions. The statements above referred to related to events leading up to the shooting and to the shooting itself. Whether these statements be considered as an admission or confession, as to which see *Commonwealth* v. *Haywood*, 247 Mass. 16, 18, they were not inadmissible because the defendant was not warned that

anything he said might be used in evidence against him. *Commonwealth* v. *Szczepanek*, 235 Mass. 411, 413. *Commonwealth* v. *Dascalakis*, 243 Mass. 519. *Commonwealth* v. *Jokinen*, 257 Mass. 429. The fact that the defendant was in custody and did not know it, and the fact, if it be one, that the medical examiner to test the defendant's mental capacity did not need to question him about the details of the crime, did not prove that the admissions of the defendant were procured by inducements engendering either hope or fear. *Commonwealth* v. *Storti*, 177 Mass. 339, 343. *Wilson* v. *United States*, 162 U. S. 613, 623.

The assignments of errors numbered 6, 7, 9 and 10 relate to the judge's charge upon the contention that the defendant was of unsound mind at the time of the shooting. It is stated in the defendant's brief that the "actual physical fact that the defendant shot the two girls in question was not denied," and that the real defence was that "as the result of a prolonged debauch of liquor drinking," the defendant being unaccustomed to liquor, and "because of disappointment and despair over the loss of his fiancee . . . [he] became insane, and while in this condition was seized by an irresistable impulse to commit an act which when sane or normal he abhorred." In discussing this matter the judge directed the jury's attention "to the absence of any medical testimony, except the very slight evidence offered by . . . [the medical examiner] with reference to his [the defendant's] condition, and the statement by Dr. Larrabee that he was unable to form an opinion while this man was there at the hospital." This was a description of the medical testimony but minimized the importance of the statement of the medical examiner that the defendant was probably sane at the time of the shooting.

The assignment of errors numbered 8 relates to that part of the charge wherein the judge said: "Assuming there were experts brought in here, half a dozen on each side, and, in answer to a hypothetical question, they gave an opinion, one set of experts saying that in their opinion he was insane at the time, and another set saying that he was not. Now, that evidence is 'opinion' evidence, merely the opinion of

these gentlemen. It is assumed that they know more about the subject, such a subject as that, than you or I, and that their opinion will be of aid to a jury in determining what is a pure question of fact, and the jury would have the right to disregard all the experts or any one of the experts, and decide the case on what they heard of this man, and his own story. So keep that in mind when you are considering that question." As respects this part of the charge, the defendant contends that it was erroneous and prejudicial because the judge in express words also should have told the jury that they could believe the experts, and that by the failure to do so they "were practically invited to throw the expert testimony out of the case." There was no error; the right to consider was evident; the right to reject was made plain. *Lindenbaum* v. *New York, New Haven & Hartford Railroad,* 197 Mass. 314.

The assignment of errors numbered 11 is not argued but it discloses no error if it be considered on its merits.

The assignments of errors numbered 12, 15, 20, 24 and 25 relate to the refusal of the judge to instruct the jury that the defendant could be found guilty of manslaughter. In the charge manslaughter was properly defined as "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." It is plain the evidence did not warrant a finding of manslaughter. It follows that the requests for instructions on this subject were properly refused, however accurate they may have been as statements of abstract principles of law. *Commonwealth* v. *Pemberton,* 118 Mass. 36, 44. *Commonwealth* v. *Feci,* 235 Mass. 562, 571. *Commonwealth* v. *Devereaux,* 256 Mass. 387, 393–394. *Commonwealth* v. *Trippi,* 268 Mass. 227, 232. The fact that the defendant was drunk at the time of the shooting might have rendered him incapable of conceiving a deliberately premeditated intention to kill necessary to be present in an indictment for murder in the first degree. *Commonwealth* v. *Parsons,* 195 Mass. 560, 571. But it would not transfer into manslaughter an act, which, if committed while the defendant was sober, would have been

murder. *Commonwealth* v. *Hawkins*, 3 Gray, 463, 466. *Commonwealth* v. *Parsons*, 195 Mass. 560, 570. *Commonwealth* v. *Gleason*, 262 Mass. 185, 191. *Commonwealth* v. *Taylor*, 263 Mass. 356, 363.

The assignments of errors numbered 13 and 14 relate to the refusal of the judge to instruct the jury to ascertain the order in which the girls were killed. The defendant contends that Angelina Rodriques was killed first or both girls were killed simultaneously, and if the killing of Angelina Rodriques could be found to be manslaughter then the other was not shot in the commission of a crime punishable by death or life imprisonment, and for her death the defendant could be convicted of manslaughter only. What the defendant really sought to ascertain was which girl was shot first, it being immaterial which of them was killed first. It is manifest the order of shooting had no relation to the nature of the crime committed and there is no evidence which would warrant a finding of manslaughter in the killing of Angelina Rodriques.

The remaining assignments of errors are based upon the refusal of the judge to give certain requests for instructions. The defendant's brief states that he "does not here contend that the court did not in a general way, and with commendable clarity, set forth before the jury the legal definitions and propositions which should govern them in passing upon the question of the defendant's responsibility for criminal acts in a case where a question has been raised as to the defendant's mental condition, unsoundness of mind, or insanity, temporary or otherwise." What the defendant was endeavoring to do through the judge was to direct "the jury's attention, to a narrower question or contention, namely, that, although there is a general presumption at the start of any case that the defendant is sane, nevertheless, when evidence has been introduced which raises a question of doubt as to the sanity or insanity of the defendant, then, in that case, the burden is upon the Commonwealth to prove, or to satisfy the jury beyond a reasonable doubt, that the defendant was sane in the sense that

he was legally responsible for his acts at the time of the offence."

The defendant sought to have the judge charge the jury as follows: "5. If the jury finds that the killing of the deceased was without malice either express or implied and without deliberation, but was due to the emotion of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, and that that state of mind actually did exist at the time of the commission of the offence, then the jury shall find the defendant guilty of manslaughter"; "6. In order to constitute a crime, a person must have intelligence and capacity enough to have a criminal intent and purpose and if his reason and mental powers are either so deficient that he has no will, no conscience or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent and is not punishable for criminal acts"; and "7. If the jury finds that at the time of the commission of the offence the defendant was temporarily so deranged on one or more of his mental or moral faculties that it actually rendered him incapable of distinguishing between right and wrong with respect to the act that he was committing, that is the killing of the deceased, then the jury shall find the defendant not guilty because of temporary insanity." The judge as respects these specific requests instructed the jury fully with careful phrasing.

The defendant sought to have the jury instructed that "The burden of proof is on the Commonwealth to satisfy the jury beyond a reasonable doubt that the defendant was legally responsible and sane at the time of the offence." In this respect the judge said: "The government must satisfy you, as I have called to your attention, that he understood that [what] he was doing, had knowledge of what he was doing, as I have already said to you. That is the burden resting upon the Commonwealth, to satisfy you upon that beyond a reasonable doubt. If you are not so satisfied, but should find that this defendant was not so capable, by

reason of mental disease, under an uncontrollable impulse to kill, springing out of it, why, your verdict would be not guilty by reason of insanity. So that would be the first issue to determine, as to his condition at the time."

A careful examination of the entire evidence reveals no error of law. The rights of the defendant were fully protected. It results that the entry must be

*Judgment on the verdict.*