COMMONWEALTH *vs.* RICHARD C. BENOIT.

Suffolk. February 7, 1983. — June 10, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions, Relevancy and materiality. *Error,* Harmless. *Practice, Criminal,* Instructions to jury, Fair trial, Access to witness, Capital case. *Homicide.*

At the hearing on a motion to suppress statements made by a defendant to police, evidence that the defendant did not appear to be intoxicated or suffering from withdrawal symptoms during the interrogation, that the interrogation was not lengthy, that the defendant answered questions freely, and that he did not complain of feeling ill warranted the judge's conclusion that purported effects of alcohol withdrawal did not impair the defendant's ability to make a valid waiver of his Miranda rights [419-420]; a different conclusion was not required either because the defendant suffered a seizure about two and one-half hours after the questioning and was hospitalized or because there were certain discrepancies in the testimony of two police officers present at the interrogation [420-421].

The judge at the trial of a criminal case did not err in refusing to charge the jury that the Commonwealth must prove beyond a reasonable doubt that statements made by the defendant to police were voluntary where the judge had accurately and adequately instructed the jury on the Commonwealth's burden of proof. [421-422]

Even though the judge in a murder trial erred in admitting evidence that the defendant had made a general statement to the effect that he was going to kill someone, in light of the evidence presented by the prosecutor this error did not require reversal. [422-423]

There was no merit to a defendant's contention that he was denied a fair trial because the judge was unfair in his treatment of defense counsel and because this alleged misconduct tainted the entire trial. [423]

Where no view of the evidence at a murder trial would have permitted a finding of either voluntary or involuntary manslaughter, the judge did not err in refusing to charge the jury on manslaughter. [424]

Requiring that there be some evidence at a murder trial on the issue of manslaughter before a jury instruction on the subject is given and before the Commonwealth is required to negate beyond a reasonable doubt

the elements of manslaughter does not violate a defendant's Fifth Amendment right against self-incrimination. [424-425]

In the circumstances the judge at a murder trial did not err in permitting the victim's daughter to testify, even though the defendant was prepared to stipulate to the facts testified to. [425]

Although the judge in a murder case abused his discretion in refusing to grant a short recess so that, before deciding whether to question a certain witness, defense counsel could interview the witness, who had been unavailable until he was arrested and brought into the courtroom, the judge's refusal did not require reversal where the witness's testimony, if not inculpatory to the defendant, would have been merely cumulative of other testimony and where defense counsel had stated that the witness's testimony was not essential to his case. [426-428]

Having reviewed the record in a murder case, including certain rulings on the issue of extreme atrocity or cruelty, in accordance with its power under G. L. c. 278, § 33E, this court concluded that the interests of justice did not require a new trial or the entry of a verdict of a lesser degree of guilt than that found by the jury. [428-430]

INDICTMENTS found and returned in the Superior Court Department on November 16, 1978, and February 15, 1979, respectively.

Following the decision of this court in 382 Mass. 210 (1981), the cases were tried before *Donohue, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Thomas E. Finnerty & James M. McDonough, Jr.*, for the defendant.

*Daniel C. Mullane*, Assistant District Attorney (*Ellen A. Donahue*, Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J. On June 19, 1979, the defendant, Richard C. Benoit, was found guilty by a jury of murder in the first degree and armed robbery. The trial judge sentenced the defendant to a term of life imprisonment on each conviction, the sentences to be served concurrently. The defendant appealed from these convictions to this court and we reversed the defendant's convictions and ordered a new trial. *Commonwealth* v. *Benoit*, 382 Mass. 210 (1981).

The indictments were then scheduled for retrial in the Supe-
rior Court in Suffolk County. The trial judge heard pretrial
motions and the defendant subsequently sought an interlocu-
tory appeal of the judge's denial of his motion to suppress. A
single justice of this court denied the appeal. The second trial
commenced on October 15, 1981. On October 23, 1981, the
jury returned verdicts of guilty of murder in the second degree
and larceny from the person. The judge imposed a mandato-
ry life sentence of the murder charge and a consecutive sen-
tence of from seven to ten years on the larceny conviction.

The defendant filed a notice of appeal from the convic-
tions in the Appeals Court, and we transferred the appeal to
this court on our own motion.[1] The defendant argues that
the trial judge erred in (1) denying his motion to suppress
certain statements he made to the police; (2) admitting a
statement of the defendant to another person that he in-
tended to kill someone; (3) allegedly treating defense
counsel unfairly; (4) refusing to instruct the jury on
manslaughter; (5) admitting the testimony of the victim's
daughter; and (6) refusing to grant defense counsel a short
recess to interview a prospective witness and in not allowing
defense counsel to call such witness. The defendant also
urges that we should exercise our power under G. L. c. 278,
§ 33E,[2] to reduce the verdict on the murder indictment
because of the number of alleged errors committed by the
judge and because of the judge's treatment of the issue of ex-
treme atrocity or cruelty.[3] We conclude that the judge

---

[1] The defendant appealed the sentence on the larceny conviction in the
Appellate Division of the Superior Court. That court amended the
sentence on the larceny conviction by substituting a sentence of from three
to five years, to be served concurrently with the sentence imposed on the
murder conviction, with credit for time served.

[2] Statute 1979, c. 346, § 2, amending G. L. c. 278, § 33E, does not ap-
ply because "the offense resulting in a second degree murder conviction
upon an indictment in the first degree was committed before July 1,
1979." *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980).

[3] None of the issues raised by the defendant on this appeal was con-
sidered by this court in the appeal from the defendant's convictions in his
first trial. See *Commonwealth* v. *Benoit*, 382 Mass. 210 (1981).

erred in admitting the defendant's statement that he was going to kill someone and in denying defense counsel a short recess to interview the prospective witness but that these errors do not require reversal of the judgments. We reject the remainder of the defendant's arguments and decline to reduce the murder verdict or to grant a new trial under G. L. c. 278, § 33E. Accordingly, we affirm the judgments.

At approximately 1:30 P.M. on Monday, November 13, 1978, the assistant manager of the Castle-Mar Motel in Revere discovered the bludgeoned body of a woman, later identified as Mary K. Ballard, in a room of the motel. He immediately called the Revere police, who arrived within minutes. The State police arrived shortly thereafter. The police officers entered the room where they saw a body partially covered with a sheet. Upon removing the sheet, the officers observed the victim's nude, bloody body with a gaping hole in the head. There was a broken wine bottle near the body and fragments of glass were found about the shoulders and side of the body. A State police officer photographed the victim's body as well as the motel room.

The police officers ascertained that the defendant had checked into the motel room on November 11, 1978. By tracing the telephone calls made from the motel room, the police located one Judy Cooper. Cooper had met the defendant on November 11, while she was on Revere Beach Boulevard in Revere. The defendant stopped her and asked her where he could find a motel. She told him that the hotels were at the other end of the beach. She asked the defendant for a ride; they rode together along the beach and at some point they stopped to buy some beer and some toothache medication. They then went to the Castle-Mar Motel where the defendant registered for a room, and they spent the day together watching television and talking. Cooper talked mostly about her daughter and a pending custody suit; the defendant told her that he had come to Massachusetts to see his children.

Cooper testified that she stayed at the motel room with the defendant until early Monday morning, November 13.

During that time she had several beers and smoked some marihuana while the defendant drank beer continuously. The defendant left the motel several times to buy beer. After one of these trips he returned with a bottle of wine.

On Sunday, November 12, Cooper and the defendant spent the day sleeping and watching television.[4] When she awoke around 7 P.M., the defendant was not in the room, although his clothes and belongings were still there. Cooper left the motel room to look at an apartment. The defendant was still out of the room when she returned.

That evening the manager of a bar in Revere and the organist who entertained in the bar saw the defendant with the victim. The manager last noticed the defendant and the victim at 1:15 A.M. At 2 A.M., when the bar closed, the manager observed that the defendant and the victim were not there. The organist left the bar at 1:30 A.M. and testified that they were still at the bar at that time.

Cooper testified that the defendant returned to the motel room with the victim between 2:15 and 2:30 A.M. Upon seeing Cooper, the victim became verbally hostile, but after the defendant explained to the victim that Cooper had some child custody problems, the victim calmed down. The victim wrote her name and telephone number on a matchbook and told Cooper to get in touch with her as she could possibly help her with the custody suit. The victim then undressed and removed a necklace and a pair of earrings which she gave to Cooper. The victim asked Cooper to stay and engage in sexual acts with them, but Cooper declined. The defendant then gave Cooper some money for taxi fare. When Cooper left the motel room, the victim and the defendant were embracing in bed.

Dr. George Katsas, a medical examiner, testified that the victim died as a result of blunt injuries to the face and head. The victim had sustained a fracture of the skull, subdural

---

[4] On Sunday Cooper telephoned one James Tully about buying some marihuana. At some time on Sunday evening, two men came to the motel room and delivered marihuana to Cooper.

hemorrhage, and contusions of the brain. At least twelve blows had been struck to her head; three or four of these wounds penetrated to the bone. Dr. Katsas could not determine how long the victim had remained conscious nor could he ascertain the order of the wounds.

On November 14, 1978, at 1:17 P.M., at a bank in Peabody, the defendant cashed a check payable to him and bearing the victim's forged signature.

On December 7, 1978, the Hartford, Connecticut, police located a car that was reported stolen from the Boston area and was involved in a murder investigation. A search of the car located a key to a motel room in Connecticut and slips of paper with some telephone numbers on them. Detective James Doyle obtained the names and addresses that corresponded with the telephone numbers. Doyle and Officer George Kingsley then went to Windsor, Connecticut, to speak with a woman whose telephone number appeared on one of the papers. Doyle and Kingsley arrived at approximately 6 A.M. and learned that the woman had received a telephone call from the defendant earlier that morning. The defendant had called from a Texaco gasoline station in Hartford, near an interstate highway.

Doyle and Kingsley arrived at the gasoline station at about 7 A.M. and found the defendant, who appeared to be asleep, in a tow truck, parked in the back of the station. Kingsley and Doyle rapped on the window. The defendant awoke and the officers identified themselves, and assisted him out of the truck. The officers patted down and handcuffed the defendant, and informed him that he was under arrest. The defendant then walked with the officers approximately thirty feet to the police car. The officers observed that the defendant had no difficulty walking, and appeared calm and sober.

The officers drove the defendant to the police station where they took him to an interrogation room. At this time the officers gave the defendant Miranda warnings. Doyle testified that he asked the defendant whether he understood his rights and the defendant responded that he did. Kings-

ley testified, however, that the defendant did not respond at
all to Doyle's question. The officers informed the defend-
ant again that he was under arrest and that there was a
murder warrant for him from Massachusetts for the death
of Mary K. Ballard.

The defendant then made an extensive statement to the
officers. He told them that he had met the victim in a bar
in Revere and had invited her back to his motel room; she
agreed to go with him. When they arrived at the motel
room, there was already a young woman in the defendant's
room. The victim was interested in having sex and invited
the other woman to join them. The other woman declined,
however, so the defendant gave her $3, and asked her to
leave, which she did. After the woman left, the defendant
and the victim engaged in sexual intercourse for a period of
a few hours. Thereafter the victim fell asleep and the de-
fendant robbed her, taking her purse and her car keys, and
then left the motel in the victim's car. Doyle asked the de-
fendant several times whether he had killed the victim. The
defendant first responded, "No," and later stated, "if I
killed her, I don't remember killing her." The defendant
explained that he had a drinking problem and that in the
past, when drinking, he had done various things of which
he later had no memory.

Doyle observed that the defendant's demeanor during the
interrogation was very calm, subdued, unemotional, and
tired. Doyle testified that the defendant appeared to be
completely sober and to understand the questions. The in-
terrogation lasted between thirty to forty-five minutes.
Doyle later learned that the defendant had become ill after
the interrogation and was taken to a hospital.

The defendant made a motion to suppress the statement
given to the Hartford police. In a voir dire hearing, the de-
fendant presented evidence that at the time of the alleged
waiver he was in an "alcoholic fugue state" and was taken
to a hospital shortly thereafter. Doyle and Kingsley
testified, as did one Kenneth Lee Main who stated that he
and the defendant had been drinking for one and one-half

days prior to the day that the defendant made the statement to the Hartford police. Lieutenant James Sharkey, a Massachusetts State police detective, testified that he had gone to Hartford after he had been apprised of the defendant's arrest and that upon his arrival at the police station before noon he learned that the defendant had been taken to a hospital. He was informed that the defendant had suffered "[a] seizure of some sort."

The judge also considered proffered testimony of Dr. Bonnie McCarthy and Officer Thomas Grodecki. Dr. McCarthy was prepared to testify that, based on hospital summaries, she concluded that at the time of the interrogation the defendant was suffering from a withdrawal syndrome. She would testify that this syndrome is characterized by confusion to the extent that the defendant would not be able to do anything knowingly or voluntarily. Officer Grodecki of the Hartford police department was prepared to testify that the defendant had a seizure while at the police station, that he was taken to the hospital where X-rays were ordered for bruises on the defendant's head and left leg, and that the defendant was treated at 11:05 A.M., given medication, released, and transported back to the police station. Finally, the judge examined reports from two hospitals — the hospital to which the defendant was taken on the day of the interrogation and a hospital to which the defendant had admitted himself on November 15, 1978.

After the hearing the judge determined that the defendant knowingly, voluntarily, and intelligently waived his Miranda rights and that the defendant's statements were voluntarily given. The judge concluded that the defendant indicated that he understood his rights, that he spoke freely with the police and was not coerced or compelled to speak, and that he showed no effects of alcohol withdrawal.

The defendant's defense was one of alibi. Although he did not testify on his own behalf, the defendant introduced his defense by way of one Mario D'Agostino. D'Agostino testified that the defendant checked into a motel in West Peabody at approximately 3:30 A.M. on November 13, 1978,

which was the same time that Lieutenant Edward Ryan of the Revere police specified as the time of the death of the victim.[5]

1. The defendant first argues that the judge erred in admitting his statements to the police because the evidence presented demonstrated that he was incapable of either giving a voluntary waiver of his constitutional rights or making a voluntary statement. We disagree.

When we review a judge's determination that a waiver of Miranda rights was voluntarily given and an admission was voluntarily made, we will grant substantial deference to the judge's ultimate conclusions and we will not reject a judge's subsidiary findings if they are warranted by the evidence. *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983). *Commonwealth* v. *Tavares,* 385 Mass. 140, 144-145 (1982). We will make an independent examination of the records, however, to ascertain whether the judge properly applied the law in a given case. *Commonwealth* v. *Williams, supra,* citing *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977). Whether there is a valid waiver or whether a statement was voluntarily given depends, as the judge in this case properly noted, upon the totality of the circumstances including the "conduct of the defendant, his physical and mental condition, his age, and the details of the interrogation." *Commonwealth* v. *Wilborne,* 382 Mass. 241, 252 (1981). See also *Commonwealth* v. *Tavares, supra* at 145-146.

In this case, the judge held an extensive voir dire to determine the admissibility of the defendant's statements. The judge specifically considered the defendant's claim that he was in an "alcoholic fugue state" at that time, finding that the purported effects of the defendant's alcohol withdrawal did not in any way impair his ability to make a valid waiver or to comprehend or respond to police questioning.

---

[5] Ryan testified that his report to the medical examiner contained an entry that Dr. Licarta, who pronounced the victim dead at the scene, had stated that the time of death was 3:30 A.M. The Commonwealth elicited on cross-examination that there was no scientific basis for establishing the precise time of death.

The judge's conclusions are supported amply by the evidence. The defendant did not appear to be intoxicated or suffering from withdrawal symptoms. The interrogation was not lengthy, lasting between thirty to forty-five minutes. During the interrogation, the defendant answered questions freely, often detailing his activities on the night of the murder. Although the defendant suffered a seizure, the judge determined that it did not occur until substantially after the time of the interrogation (almost two and one-half hours later). There is no evidence that the defendant complained of feeling ill during the questioning. In light of the evidence presented, we uphold the judge's conclusion that the defendant's alcohol withdrawal did not render either his statement or his waiver involuntary. Compare *Commonwealth v. Fielding*, 371 Mass. 97, 105-113 (1976) (where two defendants, who were addicts, were given Miranda warnings on numerous occasions throughout an interrogation lasting several hours, appeared alert, calm, and lucid during the questioning, conclusion that confessions were voluntarily made was warranted even though, about one hour after interrogation, defendants complained of suffering from withdrawal, were taken to a hospital and were treated with methadone). See also *Commonwealth v. Wilborne, supra* at 252 (fact that defendant's physical condition may be less than well does not automatically invalidate a waiver).

We reject the defendant's contention that the judge erred in denying the defendant's renewed motion to suppress made after it was revealed that the testimony of Kingsley and Doyle differed in several respects.[6] Specifically, Kingsley testified that the woman in Windsor said that the defendant called her one to two hours before they arrived on the day of his arrest, while Doyle testified that she said

---

[6] The defendant also argues that the judge erred in denying his request for a voir dire at this time. The record does not reveal, however, that the defendant requested a voir dire. We point out, however, that even if a voir dire had been requested, the judge would not have been in error had he denied the request.

that he called her at 3 A.M. Kingsley also stated that when Doyle asked the defendant whether he understood his rights, the defendant did not reply. In contrast, Doyle stated that the defendant responded that he understood. The judge denied the motion stating that he was still "convinced beyond *even* a reasonable doubt that they advised him of his rights and that he fully waived them." The judge's conclusion was reasonable. We note that Kingsley's testimony, considered in its entirety, did not materially contradict Doyle's testimony. See *Commonwealth v. Rogers*, 351 Mass. 522, 529, cert. denied, 389 U.S. 991 (1967). Indeed, these discrepancies were "of a type to be expected when testimony is given [a considerable amount of time] after the events described." *Id.* We perceive no error in the judge's determination.

The defendant's final argument with regard to the judge's treatment of the issue of the voluntariness of his statements is that the judge erred in refusing to charge the jury that the Commonwealth must prove beyond a reasonable doubt that the defendant's statements were voluntary. We conclude, however, that the judge's charge to the jury, considered in its entirety, clearly apprised the jury that the Commonwealth must prove beyond a reasonable doubt that the statements were voluntary. The judge submitted to the jurors the issue of voluntariness, charging them that before they could consider any of the defendant's statements to the police, they must be satisfied that the statements were given "voluntarily." The judge had earlier told the jurors that the Commonwealth bore the burden of proof, and that the standard of proof is beyond a reasonable doubt. The judge had further charged that the burden to convince the jury beyond a reasonable doubt always remains with the Commonwealth. Hence, although the judge did not repeat the Commonwealth's burden of proof during the instruction on voluntariness, "the law does not require repetition of the same thought at each turn." *Commonwealth v. Fitzgerald,* 380 Mass. 840, 846 (1980), quoting *Commonwealth v. Peters,* 372 Mass. 319, 324 (1977). See *Commonwealth v.*

*Gibson,* 368 Mass. 518, 528 (1975), quoting *Commonwealth* v. *Redmond,* 357 Mass. 333, 342 (1970) ("Once the trial judge gave an adequate and accurate charge on the Commonwealth's burden of proof, 'he was not required to repeat the same instruction with each of the other subjects discussed in the remainder of the charge'").

2. The defendant next contends that the judge erred in admitting a statement allegedly made by the defendant to the effect that he was going to kill someone. We agree but determine that in light of the evidence viewed as a whole, reversal of the judgments is not required. Five days before the victim was murdered, the defendant met with one Charles Clangos. Clangos lived with the defendant's wife and children; Clangos and the defendant's wife were sexually involved. The defendant and Clangos met at a hotel in Boston where they had several beers together as they conversed. During their conversation Clangos declared that the defendant would not be allowed to visit the children until he had paid child support continuously for one year directly to Clangos rather than to the Department of Public Welfare. Later in the conversation, in response to questions by the defendant, Clangos told him that his wife had been "out having a good time" with other men. Upon hearing this, the defendant became angry and stated, "Now I'm going to have to kill somebody." After conducting a voir dire, the judge concluded that the statement was relevant to the defendant's intent and admitted it.

A general statement of this nature, without more, is so lacking in probative value and so tainted with the risk of undue prejudice as to require exclusion. In *Commonwealth* v. *Wood,* 384 Mass. 641, 644 (1981), we upheld the admissibility of a statement demonstrating a general intent to commit murder. In *Wood,* however, the defendant's general statement was accompanied by an explanation of the manner in which he would dispose of a potential victim's body and the actual victim's body was disposed of in the same manner. *Id.* at 642-644. Furthermore, in *Wood,* one week after the defendant made the statement which indicated a general

willingness to commit murder, the defendant also made specific murderous threats about the victim. *Id.* at 642-643. Thus, in *Wood*, the defendant's statement which evidenced a general intent to commit murder was relevant because it was intimately connected with specific facts pertaining to the victim and the way in which the victim's body was disposed of. In contrast, the statement by the defendant in this case was an isolated comment made before the defendant even knew the victim. Even though admission of the statement was error, in light of the evidence offered by the prosecutor as a whole, this error does not require reversal of the judgments.

3. The defendant further submits that he was denied a fair trial because the judge was unfair in his treatment of defense counsel and because this alleged misconduct tainted the entire trial. This argument is without merit. A fair reading of the transcript does not show that the judge played a partisian or overzealous role or expressed his opinion on the facts. See *Commonwealth* v. *Haley*, 363 Mass. 513, 522 (1973). Moreover, most of the colloquies which the defendant discusses as evidence of the judge's animosity toward his counsel occurred during pretrial motions or at bench conferences outside the hearing of the jury. Accordingly, even if we accept the defendant's characterization of the judge's behavior, no prejudice could have resulted. See *Commonwealth* v. *Cresta*, 3 Mass. App. Ct. 560, 564 (1975). Furthermore, the few instances of alleged abusive treatment that occurred before the jury reveal no disparaging comments directed at defense counsel. Contrast *Commonwealth* v. *Sylvester*, 388 Mass. 749, 750-752 (1983); *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846-847 (1980); *Adams* v. *Yellow Cab Corp.*, 12 Mass. App. Ct. 931, 932 (1981); *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 16-17 (1980). Also, we note that, contrary to the defendant's assertion, the judge did give curative instructions. See *Commonwealth* v. *Haley, supra; Commonwealth* v. *McLaughlin*, 352 Mass. 218, 222, cert. denied, 389 U.S. 916 (1967).

4. We also reject the defendant's argument that the judge erred in refusing to charge the jury on manslaughter. No view of the evidence, even drawing all reasonable inferences in the defendant's favor, permitted a finding of either voluntary or involuntary manslaughter. There is no evidence that the killing took place in a "heat of blood, upon reasonable provocation" or "upon sudden combat." *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). The victim in the instant case was bludgeoned to death with a wine bottle. She was discovered in bed, unarmed, surrounded by pieces of the broken bottle. The medical examiner testified that more than twelve blows were struck to her face, and the top and back of her head. Three or four of these wounds penetrated to the bone. The jury should not be permitted to speculate on whether the defendant in the course of a struggle may have been roused to the heat of passion, see *Commonwealth* v. *Wilborne*, 382 Mass. 241, 246 (1981); *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980), or on whether any action on the part of the victim provoked a nonmalicious but brutal attack by the defendant; *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973). There is also no evidence to warrant an instruction on involuntary manslaughter. See *Commonwealth* v. *Walden, supra* at 730; *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 490-492 (1977); *Commonwealth* v. *Hicks*, 356 Mass. 442, 445 (1969).

The defendant urges that requiring him, as a prerequisite to obtaining an instruction on manslaughter, to provide evidence of mitigating factors impermissibly shifts the burden of proof from the Commonwealth to the defendant. He relies on *Mullaney* v. *Wilbur*, 421 U.S. 684, 704 (1975), where the Supreme Court held that the "Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of heat of passion or sudden provocation when the issue is properly presented in a homicide case." He acknowledges that in *Mullaney* the Supreme Court specifically stated that nothing in the opinion prohibited a State from requiring a defendant to introduce some evidence in-

dicating that he acted in a heat of passion before requiring the
State to negate this element beyond a reasonable doubt. *Id.* at
701 n.28. See *Gagne* v. *Meachum,* 460 F. Supp. 1213, 1220
(D. Mass. 1978), aff'd, 602 F.2d 471 (1st Cir.), cert. denied,
444 U.S. 992 (1979). He contends, however, that we should
not follow the Supreme Court's reasoning, particularly in this
case, because requiring the defendant to introduce some
evidence would force him to relinquish his Fifth Amendment
right not to testify. We conclude, however, that a require-
ment that there be some evidence on the issue of manslaughter
before a jury instruction is given and before the Common-
wealth must negate beyond a reasonable doubt the elements of
manslaughter does not violate a defendant's constitutional
rights.

5. The defendant next contends that the judge erred in ad-
mitting the testimony of the daughter of the victim because
the testimony added nothing to the Commonwealth's case
while it substantially prejudiced the defendant. We conclude,
however, that the judge did not abuse his discretion in allow-
ing the victim's daughter to testify. The judge conducted a
voir dire to determine what she would say. The judge then al-
lowed her to testify and to identify the victim as her mother, as
well as the victim's possessions. These issues were clearly rele-
vant to the Commonwealth's case. Furthermore, although
the defendant was prepared to stipulate to these facts, "a judge
may admit relevant evidence even if a party has agreed to
stipulate to the fact that the offered evidence tends to prove."
*Commonwealth* v. *Bastarache,* 382 Mass. 86, 106 (1980). We
note further that the witness's testimony covers only four pages
of the transcript, that there was no objection to any particular
question asked, and that the testimony was not accompanied
by an emotional outburst. See *Commonwealth* v. *Chasson,*
383 Mass. 183, 185 (1981); *Commonwealth* v. *Chung,* 378
Mass. 451, 452 n.1 (1979). Finally, the judge instructed the
jury that sympathy should not be considered by them in reach-
ing their verdicts. In light of these circumstances, we con-
clude that the judge did not abuse his discretion.

6.  The defendant asserts that the judge erred in refusing to grant defense counsel a short recess to interview one James Tully, and further erred in precluding defense counsel from calling Tully as a witness the next day.  Tully sent two men to the Castle-Mar Motel to deliver marihuana to Judy Cooper.  During the defendant's first trial, Tully had invoked his Fifth Amendment privilege not to testify.  At this trial, the prosecutor, at the defendant's request, issued a summons for Tully.  Tully failed to appear and the judge issued a capias for his arrest.  When Tully was brought into the court room, he was placed on the witness stand and defense counsel was directed to question him.  The jury were not present at this time.  Defense counsel refused to question Tully without being given an opportunity to interview him first.  The judge refused to grant a short recess and told defense counsel that he could interview Tully on the witness stand during the voir dire.

The judge's refusal to allow a short recess for defense counsel to interview Tully in private was error.  It is clear from our cases that a defendant in a criminal case should be accorded, as of right, an opportunity to interview a material witness held in the custody of the Commonwealth.  *Commonwealth* v. *Flynn*, 362 Mass. 455, 461 (1972).  *Commonwealth* v. *Carita*, 356 Mass. 132, 142 (1969).  *Commonwealth* v. *Balliro*, 349 Mass. 505, 515-518 (1965).  In this case, Tully was not a witness held in the custody of the Commonwealth but rather was a witness who could not be located except through judicial process.  Notwithstanding this factual distinction, we conclude that the defendant was entitled to interview Tully before deciding to call him as a witness.  The Federal courts have recognized that both the prosecution and the defendant in a criminal case have the right to interview witnesses.  See, e.g., *Salemme* v. *Ristaino*, 587 F.2d 81, 87 (1st Cir. 1978); *United States* v. *Murray*, 492 F.2d 178, 194 (9th Cir. 1973), cert. denied sub nom. *Roberts* v. *United States*, 419 U.S. 854 (1974); *Callahan* v. *United States*, 371 F.2d 658, 660 (9th Cir. 1967); *Gregory* v. *United States*, 369 F.2d 185, 188 (D.C. Cir. 1966), appeal after remand, 410 F.2d 1016 (D.C. Cir.), cert.

denied, 396 U.S. 865 (1969). In this case, although it was 4 P.M. when Tully was brought into the court room, a short recess would not have interfered substantially with the progression of the trial. Indeed, the judge had indicated to defense counsel that he was willing to stay until 6 P.M. while defense counsel questioned Tully on the stand. Furthermore, the judge was aware that if Tully did not claim a Fifth Amendment privilege he might provide testimony inculpating the defendant and it does not appear that the judge was prepared to grant the defendant a recess to interview Tully in the event that he waived his privilege.[7] Thus, the judge improperly placed defense counsel in the position of possibly eliciting testimony that would inculpate his client. Since Tully had invoked his Fifth Amendment privilege at the first trial, defense counsel did not know what the substance of Tully's testimony might be. Clearly, any interest in judicial economy did not outweigh defense counsel's right to interview Tully privately to ascertain whether he would waive his privilege and, if so, to what he was prepared to testify. Accordingly, we conclude that the judge abused his discretion in denying the defendant's request for a short recess.

When defense counsel refused to call Tully as a witness without being allowed to interview him in advance, the judge informed defense counsel that unless he agreed to question Tully at a voir dire he would be precluded from calling Tully as a witness. The next day, defense counsel attempt-

---

[7] Before a capias was issued for Tully's arrest, the judge engaged in the following discussion with defense counsel:

THE JUDGE: "There was some indication earlier that Mr. Tully may feel that he has — may have a privilege not to testify, is that it?"

DEFENSE COUNSEL: "That's the way he went the last time, your Honor."

THE JUDGE: "Well, he may not go this time, but my question is: Do you want him to testify? Do you feel that he's essential to your case?"

DEFENSE COUNSEL: "I'd like to have him. I wouldn't say 'essential.'"

THE JUDGE: "Well, no, no. Don't say 'like,' because I may very well find out he has no privilege, and I may say 'Mr. Tully, you answer, or you go to the slammer.' So, now, do you want him? You may not want him now."

ed to call Tully as a witness and the judge precluded him from doing so. The defendant argues that this ruling was also in error. Since the judge erred in not allowing defense counsel the opportunity to interview Tully before calling him as a witness, the judge's later ruling on the defendant's right to call Tully as a witness is tainted by this error.

We determine, however, that the judge's error was harmless. Tully's testimony, if not inculpatory to the defendant, would have been merely cumulative of other testimony.[8] Cf. *Commonwealth* v. *Watkins*, 375 Mass. 472, 488 (1978) (upholding judge's refusal to compel attendance of witness whose testimony was available through other witnesses); *Commonwealth* v. *Funderberg*, 374 Mass. 577, 579-581 (1978) (attendance of witness need not be compelled where testimony would just corroborate other testimony); *Commonwealth* v. *Blazo*, 10 Mass. App. Ct. 324, 328 (1980) (defendant's right to present witness in his own behalf is not absolute). If Tully had decided to exercise his Fifth Amendment privilege, the judge could have refused to allow him to testify. See *Commonwealth* v. *Nadile*, 10 Mass. App. Ct. 913 (1980). Cf. *United States* v. *Johnson*, 488 F.2d 1206, 1211 (1st Cir. 1973) (neither side has right to benefit from any inferences that jury may draw from witness's assertion of privilege). Furthermore, it is clear from defense counsel's own remarks to the judge that Tully's testimony was not "essential" to his case. Accordingly, we conclude that the judge's error does not require reversal of the judgments.

7. The defendant's final argument is that under G. L. c. 278, § 33E, we should reduce the defendant's conviction of murder in the second degree to manslaughter or remand

---

[8] Judy Cooper testified that she had called Tully in order to purchase some marihuana. Tully sent two men to the Castle-Mar Motel with the marihuana. These men arrived while the defendant was out. Lieutenant Ryan testified for the defense that his investigation substantiated this. Sergeant Edward Leach testified for the defense that during the course of his investigation, Tully told him that he had been asleep on November 13, 1978, at 3:30 A.M.

for a new trial in light of the number of alleged errors committed by the judge as well as the judge's treatment of certain evidentiary issues regarding the charge of exteme atrocity or cruelty. We reject the defendant's contentions.

With regard to the issue of extreme atrocity or cruelty, the defendant argues that the judge (1) improperly admitted certain photographs, and (2) improperly denied the defendant's motion for a required finding of not guilty on this charge. During its case-in-chief, the Commonwealth introduced photographs taken at the scene which showed the extent and nature of the victim's injuries. The photographs were admitted during the testimony of a State police detective. The defendant argues that they should have been admitted only in conjunction with the testimony of the medical examiner for the limited purpose of assisting him in his explanation to the jury of the cause of death. The determination of the admissibility of photographs, however, is left "almost entirely to the discretion of the trial judge." *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). In this case, the photographs were relevant to the issue of exteme atrocity or cruelty. *Commonwealth* v. *Bys*, 370 Mass. 350, 360 (1976). Moreover, even though the photographs may have had an inflammatory effect and even though the condition shown by the photographs could have been described by oral testimony, the photographs, nevertheless, are admissible. *Id.* Thus, the defendant's argument is without merit.

The defendant further submits that because no evidence was presented on the consciousness and degree of suffering of the victim, the judge improperly denied his motion for a required finding on extreme atrocity or cruelty. Since the jury returned a verdict of murder in the second degree, this ruling, even if erroneous, was harmless. In any event, conscious suffering has never been an indispensable element of the crime of murder with extreme atrocity or cruelty. *Commonwealth* v. *Podlaski*, 377 Mass. 339, 348 (1979). *Commonwealth* v. *Golston*, 373 Mass. 249, 259-260 (1977), cert. denied, 434 U.S. 1039 (1978). *Commonwealth* v. *Satterfield*, 362 Mass. 78, 81-83 (1972).

Finally, we have exercised our powers of review under G. L. c. 278, § 33E, and conclude that the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt than that found by the jury.

*Judgments affirmed.*