COMMONWEALTH *vs.* VANYA V., a juvenile.

No. 08-P-1196.

Essex. May 8, 2009. - October 9, 2009.

Present: BERRY, MILLS, & WOLOHOJIAN, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Inventory. *Resisting Arrest.*

A Juvenile Court judge erred in denying the juvenile's pretrial motion to suppress the contents of a locked bank bag that police seized from him at the time of his arrest and subsequently opened at the police station, without a warrant, by cutting the stitching of the bag, where the contents of the bag were not obtained as a result of a legitimate inventory search, in that the written police inventory policy did not spell out what to do with locked containers as opposed to those that are simply closed, and where to permit an officer to destroy or break into a locked container to conduct an inventory search, in circumstances in which there was no immediate danger that required that the container be opened, would run counter to the very purpose of the inventory exception to the warrant requirement. [373-375] BERRY, J., concurring.
The evidence at the trial of a juvenile delinquency complaint was more than sufficient to support the charge of resisting arrest. [375-376]

COMPLAINTS received and sworn to in the Essex County Division of the Juvenile Court Department on February 27, 2007.

A pretrial motion to suppress evidence was heard by *Amy L. Nechtem,* J., and the cases were heard by her.

*Elena M. Rosnov* for the juvenile.

*Ronald DeRosa,* Assistant District Attorney, for the Commonwealth.

WOLOHOJIAN, J. Officer Gallo of the Marblehead police department was on routine patrol when, shortly after midnight on February 27, 2007, he saw the juvenile walking up the driveway of Marblehead High School. It was a school night, but long after school was closed. The officer approached and asked for the juvenile's name, age, and destination. In response, the juvenile

gave his name and said that he was fifteen years old, that he was a student at the high school, and that he was walking home. Officer Gallo knew that the high school had a policy prohibiting people on its property after 10:00 P.M. unless there was a school function. The purpose of the policy was to avoid vandalism. The officer also knew that students, such as the juvenile, were required to sign a sheet containing the school's rules. He told the juvenile that the school prohibited him from being on school grounds and said that he would drive him home. The juvenile agreed. Officer Gallo would not have allowed the juvenile to leave once he told him that he was going to drive him home.

Although the officer believed that he had probable cause to arrest the juvenile for trespassing, he had no intention of doing so. Instead, Officer Gallo simply intended to drive the juvenile home to his parents, as he did with any teenager[1] he came across who was out after midnight. Because Officer Gallo intended to put the juvenile in the back seat of his police cruiser without handcuffs, he told the juvenile that he would pat frisk him for weapons before the juvenile sat behind him in the cruiser. This too was one of the officer's standard procedures, designed to ensure his safety.

In the small of the juvenile's back and under his baggy sweatshirt, Officer Gallo felt a hard object of five inches by four inches that had a ninety degree angle. When Officer Gallo touched his back, the juvenile "freaked out," striking the officer with his forearm. The juvenile's reaction, combined with the object's size and shape, led Officer Gallo to think that what he felt was a weapon. He asked the juvenile to keep his hands out and to calm down. The juvenile did neither, instead flailing his arms, striking the officer, and attempting to keep him away. The two ended up on the ground. By this time, Officer Gallo had called for backup, and Officer Sinclair arrived. Officer Sinclair smelled the odor of burnt marijuana.

The officers removed a cellular telephone and a keychain with three keys from the juvenile's pockets. Under the juvenile's sweatshirt was a nylon bag with drawstrings that he was wear-

---

[1] Officer Gallo's practice was to drive home anybody under the age of sixteen who was out after midnight, unless he had spoken to their parents beforehand.

ing like a backpack.[2] While Officer Sinclair stayed with the juvenile, Officer Gallo took the backpack to the front of his car, about twenty feet away, and opened it. Inside was a locked zippered bank bag. It contained the hard object that Officer Gallo had earlier felt, but he could not tell what it was because the bag was locked.

While Officer Gallo was near the front of the car, looking in the backpack, the juvenile and Officer Sinclair began to wrestle after the juvenile (who was not handcuffed) reached his cellular telephone and made a call.[3,4] Officer Gallo returned to the back of the car, and the juvenile was handcuffed and told that he was under arrest for trespassing and resisting arrest.

The juvenile was taken to the station, where he was asked to give permission to open the locked bank bag. He did not respond. Officer Gallo tried unsuccessfully to open the bag with the three keys that had been removed from the juvenile's pockets. Officer Gallo and the lieutenant on duty asked the juvenile's mother and her boyfriend (who had come to the station with her) for permission to open the bag. The boyfriend consented, but the mother said nothing. Officer Gallo then used a pocket knife to cut the stitching of the bag and opened it. Inside were (1) a digital scale, (2) a plastic bag containing twelve smaller plastic baggies, each containing marijuana, (3) a plastic bag containing two buds of marijuana, (4) some empty plastic baggies, and (5) ninety-one dollars in cash.

The juvenile was charged in delinquency complaints with trespassing (G. L. c. 266, § 120), resisting arrest (G. L. c. 268, § 32B), distribution of a class D substance (marijuana) (G. L. c. 94C, § 32C), and a drug violation in a school zone (G. L. c. 94C, § 32J). After a bench trial, he was adjudicated delinquent of all charges except trespassing.

---

[2]In order to remove the backpack, the officers first had to remove the juvenile's sweatshirt.

[3]Officer Sinclair, having been trained that cellular telephones could be used as weapons, took it away.

[4]The juvenile called his mother. When she answered the telephone, she heard the juvenile on the other end seemingly engaged in a struggle. The telephone then went dead. Understandably alarmed, she called the police department and was told that the juvenile was under arrest and being brought into the station. She then went to the station with her boyfriend.

1. *Motion to suppress.* The juvenile appeals from the denial of his motion to suppress the contents of the locked bank bag, which he contends were seized in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.[5] He focuses on three events, all of which he contends were unconstitutional: the initial patfrisk, the search of the backpack at the scene, and the opening of the bank bag at the station. Although the juvenile contends that all three are unconstitutional, we need not consider the first two because neither yielded anything that the juvenile sought to suppress or that, as a practical matter, supports the drug charges against him.[6] It was not until the officers reached the station that the drugs and drug paraphernalia were found. We, therefore, begin with the station house search, which the Commonwealth defends as a valid inventory search.

The Marblehead police department's inventory policy provides, "Any container or article found on the arrestee's person or carried by him shall be opened and its contents inventoried." The juvenile argues that the policy is impermissibly vague because it "is silent with respect to locked containers versus closed containers."

An inventory search must be reasonable, *South Dakota* v. *Opperman*, 428 U.S. 364, 372-373 (1976), and to determine whether it is, "we must 'balanc[e] its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate

---

[5]The juvenile's motion sought to suppress "marijuana, two medium sized buds, in clear ziploc bags, marijuana in twelve small bags within one ziploc bag, and one dodo digital scale." It also presumably sought to suppress the bank bag, although it did not specifically state so.

[6]Even assuming, as the Commonwealth contends, that the backpack was opened incident to arrest, the items were not obtained as a result of that search. The scope of a search incident to arrest has spatial and physical limitations, which preclude considering the search at the station to be incident to arrest. See, e.g., *Arizona* v. *Gant*, 129 S. Ct. 1710, 1723 (2009) (police are authorized to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and "within reaching distance of the passenger compartment at the time of the search"); *Commonwealth* v. *Alvarado*, 420 Mass. 542, 554 (1995) (search must be contemporaneous with the arrest); *Commonwealth* v. *Elizondo*, 428 Mass. 322, 323 (1998) (search must be within the area of the defendant's immediate control); *Commonwealth* v. *Pierre*, 72 Mass. App. Ct. 580, 585-587 (2008), *S.C.*, 453 Mass. 1010 (2009) (discovery of contraband during an inventory search at a police station one to one and one-half hours after an arrest was not "incident" to that arrest).

governmental interests.' " *Illinois* v. *Lafayette*, 462 U.S. 640, 644 (1983), quoting from *Delaware* v. *Prouse*, 440 U.S. 648, 654 (1979). "A range of governmental interests supports an inventory process." *Illinois* v. *Lafayette*, 462 U.S. at 646. These interests include protecting the arrestee's property, protecting the police from false claims of theft, and public safety. See *ibid.* An inventory search of "every item carried on or by a person who has lawfully been taken into custody by the police will amply serve the important and legitimate governmental interests involved." *Id.* at 648.

Although it is not unreasonable for police officers to conduct an inventory of "any container or article" — including closed containers — in a person's possession, the search must follow "established inventory procedures." *Ibid.* See *Colorado* v. *Bertine*, 479 U.S. 367, 376-377 (1987) (Blackmun, J., concurring) ("Thus, it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every [case]"); *Commonwealth* v. *Caceres*, 413 Mass. 749, 755 (1992) ("an unlocked closed container may be searched pursuant to specific written police inventory procedures without violating art. 14"). "Police procedures can be considered 'standard' only if they are set forth in writing." *Commonwealth* v. *Garcia*, 409 Mass. 675, 681 (1991), quoting from *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988).

The underlying rationale for the inventory exception to the Fourth Amendment and art. 14 is the same: police "are not vested with discretion to determine the scope of the inventory search." *Colorado* v. *Bertine*, 479 U.S. at 376. See *Commonwealth* v. *Rostad*, 410 Mass. 618, 622 (1991). The written policy must be "explicit enough to guard against the possibility that police officers would exercise discretion with respect to whether to open closed [containers] as part of their inventory search." *Ibid.* It is "unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit." *Illinois* v. *Lafayette*, 462 U.S. at 648.

Here, the policy was insufficiently precise in two respects. First, it did not spell out what to do with locked containers as

opposed to those that are simply closed. As a subset of this, the policy also did not spell out what should be done with a locked container for which the officers have the key and a locked container for which they do not.[7] Second, accepting the Commonwealth's position that the bank bag was "opened" pursuant to the policy requires stretching the meaning of "open" to a degree that would allow officers to choose among a limitless range of options, including (as here) destruction.

We have found no case that would permit an officer to break into or damage a locked container in order to conduct an inventory search. The purpose of an inventory is to protect the property of the owner and to protect officers from claims by the owner that the property was damaged. Permitting an officer to destroy or break into a locked container runs counter to the very purpose of the inventory exception. See *Tennessee* v. *Cabage*, 649 S.W.2d 589, 592 (Tenn. 1983). Moreover, breaking into the locked bank bag served no noninvestigatory purpose. There is no suggestion that the bag presented an immediate danger that required that it be opened immediately to protect public safety.

We conclude that the contents of the locked bank bag were not obtained as a result of a legitimate inventory search and, therefore, should have been suppressed. Suppression of the contents of the locked bank bag in turn requires that the adjudications based on the drug charges be reversed, there being no other evidence to support those charges. That being the case, whether the patfrisk or the search incident to arrest were valid are questions we need not, and do not, reach. Neither resulted in the discovery of evidence to support any of the adjudications.

2. *Sufficiency of the evidence.* Viewed most favorably to the Commonwealth, the evidence was more than sufficient to support the charges of resisting arrest.[8] Officer Gallo told the juvenile that he was under arrest as soon as he and the juvenile "fell down the first time" at "[t]he very beginning of the struggle."

[7]We note by way of contrast that the State police department's policy distinguishes between locked containers for which a key is available, and locked containers for which no key is available. See *Commonwealth* v. *Difalco*, 73 Mass. App. Ct. 401, 403 (2008)

[8]Because of our decision regarding the motion to suppress, we need not address the juvenile's argument regarding the sufficiency of the evidence on the drug charges. Were we to have reached the question, however, we would have found that the evidence was sufficient to support the adjudications.

Thereafter, the juvenile kept struggling with Officer Gallo. He also physically struggled with Officer Sinclair. See *Commonwealth* v. *Grant*, 71 Mass. App. Ct. 205, 208 (2008) (resisting arrest charge appropriate where the person has been seized or detained for the purpose of effectuating an arrest, and the person understands that); G. L. c. 268, § 32B. The juvenile's mother testified that she heard a scuffle involving the juvenile when he called her on his cellular telephone after his arrest. These circumstances are far different from those in *Commonwealth* v. *Smith*, 55 Mass. App. Ct. 569, 574-576 (2002), upon which the juvenile relies, where the physical confrontation occurred during an investigatory stop, not in connection with an arrest.

For the reasons set forth above, the adjudication of delinquency for resisting arrest (G. L. c. 268, § 32B) is affirmed and the adjudications of delinquency for distribution of a class D substance (marijuana) (G. L. c. 94C, § 32C), and a drug violation in a school zone (G. L. c. 94C, § 32J) are reversed.

*So ordered.*

BERRY, J. (concurring). This is a case in which, at critical points in the interaction between law enforcement and the juvenile, there were flaws that rendered the patfrisk seizure of the juvenile's backpack and the opening of the locked bank bag enclosed therein inconsistent with the constitutional protections against warrantless search ensured by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.

I write separately in concurrence for two reasons. First, in my judgment, there was an unconstitutional patfrisk of the juvenile. Second, I believe it is fundamental that a warrant is what the United States and Massachusetts Constitutions speak of as the sine qua non of search and seizure protections, which should be developed in greater depth, and I write to emphasize that an inventory search is a warrantless search as to which the Commonwealth bears the burden of proof of justification. As developed herein, I conclude that the appropriate analysis is that what was an unconstitutional patfrisk leading to the seizure of the backpack and locked bank bag cannot thereafter be saved by the ensuing

unconstitutional opening of the locked bag without a warrant under a police inventory policy which, if for law enforcement inventorying purposes is deemed to extend to the opening of locked containers, exceeded constitutional limits.

Turning first to the patfrisk — as the majority acknowledges — there is absolutely nothing in the suppression record that yields the basis for a reasonable suspicion that the juvenile was armed and dangerous. Rather, all that underlay the patfrisk is a reference to the police officer's "standard procedure" to patfrisk any youth whom the officer planned on driving home to his parents' house. "A patfrisk is constitutionally justified [only] when an officer reasonably fears for his own safety or the safety of the public . . . or when the police officer reasonably believes that the individual is armed and dangerous." *Commonwealth* v. *Isaiah I.*, 450 Mass. 818, 824 (2008). The fear or belief that an individual is armed and dangerous "must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience." *Commonwealth* v. *Wilson*, 441 Mass. 390, 394 (2004). See *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974). See generally *Terry* v. *Ohio*, 392 U.S. 1 (1968). In this case, given the lack of specific articulable facts that the juvenile was armed and dangerous prior to the patfrisk, suppression would be compelled.[1]

Furthermore, the unconstitutionality of the patfrisk casts a continuing taint over the seizure of the locked bank bag and the discovery of the marijuana and ninety-one dollars in cash within that locked bank bag. This taint under the exclusionary rule would yield suppression of this evidence *unless* there existed an intervening event in the police encounter that provided independent, constitutionally acceptable grounds for the opening of the locked container. Only such an independent, constitutionally acceptable law enforcement action would, in effect, override the prior constitutionally "bad" seizure from the patfrisk,

---

[1] I do not question the good motives of the police officer who had a practice of not arresting youths in circumstances such as here presented but instead drove them home to their parents (albeit first pat frisking them before entry into the cruiser). However, even though this practice was well intentioned, noble motives cannot displace constitutional protections. It strikes me as unreasonable for a person to lose the right to be protected from an unconstitutional patfrisk for a free ride that was never asked for.

and erase the taint. There is no such independent basis in what is cited as the Marblehead police inventory policy. I do not see that inventory policy, as applied in this case, as providing independent constitutional validity.

"[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts, and does not change character from its success." *United States* v. *Di Re*, 332 U.S. 581, 595 (1948) (footnote omitted).

The constitutional validity of the opening and search of the locked bank bag in this case, conducted without any warrant, must meet the following constitutional measures: "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it.' " *Chimel* v. *California*, 395 U.S. 752, 762 (1969), quoting from *United States* v. *Jeffers*, 342 U.S. 48, 51 (1951). Where a search is conducted "without a warrant the burden of establishing its reasonableness is on the Commonwealth." *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). "[A]ny government seizure and search of personal property, located in an area where the owner has a legitimate expectation of privacy, [is] per se unreasonable unless accomplished pursuant to a properly issued warrant." *Commonwealth* v. *Nattoo*, 452 Mass. 826, 831 (2009), quoting from *Commonwealth* v. *Straw*, 422 Mass. 756, 758 (1996). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specially established and well-delineated exceptions." *Katz* v. *United States*, 389 U.S. 347, 357 (1967) (footnote omitted).

The exception to the warrant requirements of the Fourth Amendment and art. 14 invoked to justify the warrantless search in this case involves, as noted, a police inventory search. The constitutional validity of a police inventory search must meet the following constitutional measures. Under art. 14 of the Declaration of Rights, inventory searches must be conducted pursuant to standard police procedures, which must be in writing. See *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988). "If a warrantless search is to be recognized as a lawful inventory search, there must be at least a showing that it was conducted for some legitimate police purpose other than a search for evidence." *Commonwealth* v.

*Benoit*, 382 Mass. 210, 219 (1981), *S.C.*, 389 Mass. 411 (1983). An inventory search — a warrantless search that it is — is not to be conducted for purposes of investigation, or the gathering of evidence, but only for the purposes of "safeguarding the [item taken by law enforcement], protecting the police against unfounded charges of misappropriation, protecting the public against the possibility that the [item] might contain weapons or other dangerous instrumentalities that might fall into the hands of vandals, or a combination of such reasons." *Commonwealth* v. *Muckle*, 61 Mass. App. Ct. 678, 682-683 (2004).

In this case, the opening of the locked bank bag was effected by the police absent any present danger, absent an exigency, and notwithstanding that the locked bag could easily have been inventoried as a discrete object, and a warrant sought from a "neutral and detached magistrate. . . . Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity." *Johnson* v. *United States*, 333 U.S. 10, 14 (1948).

Given the government's burden of establishing the reasonableness of warrantless searches, *Commonwealth* v. *Antobenedetto*, *supra*,[2] the "inventory search" achieved in this case by opening the bank bag, in my view, extended beyond the constitutional parameters of the inventory exception to the warrant requirement. I read the inventory-based constitutional standards to mean that before opening a locked container, there must be some basis for concluding that inventorying the locked container as a discrete unit without the intrusion of breaking the lock and opening the container is not reasonably practicable, and that a search warrant cannot be sought, for example, because of a clear danger to the police or public or some other exigency. Otherwise,

---

[2]No Massachusetts case, to the extent I can discern, has held that an inventory policy, such as that at issue here, authorizes the opening of locked containers. This may be an open question. See Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 15-4[b], at 15-10 (2009-2010). "While the cited cases reflect that, under proper standardized written procedures, police may conduct an inventory search of both the locked passenger compartment and the locked trunk of a properly impounded vehicle, as well as any closed containers within these compartments, . . . the Supreme Judicial Court has yet to decide whether locked containers may be inventoried without offending Article 14." *Ibid.*

what should be a narrow "well-delineated" exception to the warrant requirement, *Katz* v. *United States*, *supra*, transforms and broadens into a general, open-ended power for the government to open locked containers where there is a weighty expectation of privacy. That a container is locked enhances constitutionally based reasonable expectations of privacy. "[T]he protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas* v. *Illinois*, 439 U.S. 128, 143 (1978). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society*" (emphasis added). *Id.* at 143 n.12. When a person locks a container, it is understood that privacy is being safeguarded.

If, however, rather than inventorying a secured private, locked container as a discrete unit, a more expansive search authority is sanctioned by a broad reading of an inventory policy, it would confer governmental power to search absent a warrant. This is like a general warrant, which is precisely what the Fourth Amendment and art. 14 were designed to protect against. In contrast, the seeking of a warrant would be reasonably practicable and would adhere to Fourth Amendment and art. 14 protections, if, inter alia, (i) the locked container does not pose imminent danger to the police or public (in this case, the locked container had been transported from the arrest scene in a cruiser, indicating that there was no perceived danger); (ii) the locked container may be inventoried as a discrete item and a warrant sought (that is precisely the practice in the State police inventory policy discussed in *Commonwealth* v. *Caceres*, 413 Mass. 749, 754 n.5 [1992], and *Commonwealth* v. *Difalco*, 73 Mass. App. Ct. 401, 403-405 [2008][3]); and (iii) there is no exigency pressing for opening the locked container without seeking a warrant. Indeed, in this case,

---

[3]As described in *Commonwealth* v. *Caceres*, 413 Mass. at 754 n.5, "[t]he [State police] regulations direct that locked personal containers should be inventoried as a unit and should not be opened 'unless the officer has reasonable suspicion there are explosives, weapons or other substances that present[] . . . a potential danger to the officer or the public.' " Similarly, the State police policy addressed in *Commonwealth* v. *Difalco*, 73 Mass. App. Ct. at

from all that appears in the suppression hearing, there was no reason why a warrant was not sought to open this locked bank bag. To allow the opening of locked containers without the demonstration of any reason why a warrant could not be sought empowers general and open government searches that purport to be based on inventorying, but which, in actuality, are at odds with the rationales central to the limited inventory exception to the warrant requirement.[4] Both the Fourth Amendment and art. 14 were founded on protection against such general, warrantless searches. See 2 Legal Papers of John Adams at 139-144 (Wroth & Zobel eds. 1965).

Given that warrantless searches are deemed per se unreasonable under the Fourth Amendment and art. 14; given that the Commonwealth has the burden to justify a warrantless search; given that any exception to the warrant requirements of the Federal and Massachusetts Constitutions is to be narrowly confined; given that, in this case, the rationales for the inventory exception for a warrantless search — such as protection from danger, safeguarding contents, avoiding claims of misappropriation of what was within the locked bank bag — were not established so as to meet the Commonwealth's burden of proof with respect to the warrantless search, I believe the taint of the unconstitutional pat-frisk endured and the opening of the locked bank bag did not meet the standards for the inventory exception to the warrant requirement. The exclusionary rule compels suppression.

---

403, distinguished locked containers from locked glove compartments and trunks by specifically requiring that a locked container be inventoried as a single unit, and requiring the police to obtain a search warrant to open it. See Department of State Police, General Order TRF-10 (Jan. 1998), which provides that "[l]ocked containers should be inventoried as a single unit" and "[a] search warrant should be obtained before the search of a locked container (or the glove compartment and trunk if they are locked and the officer does not have a key)."

[4]The Marblehead police inventory policy is silent as to locked containers. The policy only states, "Any container or article found on the arrestee's person or carried by him shall be opened and its contents inventoried." In *Commonwealth v. Difalco, supra* at 404, this court held that a police inventory policy that stated that the contents of unlocked containers and packages should be inventoried separately, but was silent as to opening locked containers, did "not permit an inference . . . that a locked container may be opened if the police have a key. . . . [T]here [was] no explicit authority for the police to unlock a closed container and inventory the contents, and . . . the officer in this case could do no more than inventory a locked container as a single unit."